**Renja SIGURDSON,**
**Petitioner, Appellant,**

v.

**ISANTI COUNTY, et al., Respondents.**

**No. C9-84-1138.**

Supreme Court of Minnesota.

May 9, 1986.

---

David A. Singer, Minneapolis, for appellant.

Richard A. Beens, Anoka, for respondents.

WAHL, Justice.

Appellant, Renja Sigurdson, an employee of the Isanti County Assessor's Office since 1975, brought suit under the Human Rights Act, Minn.Stat. § 363.03, subd. 1(2)(c) (1984), against respondents Isanti County; Aaron Boettcher, her former supervisor; and Frank Mennenga, her current supervisor. She alleged gender discrimination regarding her training opportunities, work assignments, and compensation through June 1981 and alleged discrimination in promotion and training opportunities, work assignments, and compensa-tion since that time in reprisal for bringing charges of discrimination. An advisory Isanti County District Court jury found discrimination on the basis of sex and damages to Sigurdson of $19,500 for loss of wages and of $450 for mental suffering and anguish, but found no discrimination in reprisal for her complaints of sexual discrimination. Rejecting the advisory jury's finding of discrimination, the trial court found no discrimination, denied recovery on all of Sigurdson's claims, and awarded the county $3,600 for attorney fees pursuant to Minn.Stat. § 363.14, subd. 3 (1984). In making its findings of fact and conclusions of law, the trial court did not utilize the three-step analysis established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and adopted by this court in *Danz v. Jones*, 263 N.W.2d 395 (Minn.1978). *See also, Hubbard v. United Press International, Inc.*, 330 N.W.2d 428 (Minn.1983). The court of appeals, 363 N.W.2d 476, affirmed the trial court's finding that there was no discrimination against Sigurdson, but reversed the award of attorney fees to the county. We affirm the judgment of the court of appeals regarding the award of attorney fees, but otherwise reverse the judgment and remand to the trial court for clarified findings and conclusions in specific conformance with the *McDonnell Douglas* analysis.

In February 1975, Sigurdson was hired for a secretarial position in the county assessor's office at a starting annual salary of $4,884. Boettcher was county assessor at the time. He administered a loosely structured office with a staff of five to six persons. At any given time, two or three staff members were "deputy assessors" while the others were secretaries or "clerks." Until the summer of 1979, all the clerks were female; all the deputy assessors were male. The in-office work of the deputy assessors substantially overlapped with that of the clerks. Deputy assessors, however, were paid approximately $4,000 more annually than clerks, and only deputy

assessors were allowed to do outside field appraisal work. One qualification for the position of deputy assessor was state certification. After Sigurdson observed the improved career and salary opportunities of the deputy assessors, she requested approval to take course work that would lead to her certification in appraising. Approval was granted, and Sigurdson became certified on December 1, 1976.

After certification, Sigurdson continued to be employed by the assessor's office in a clerical position but directed numerous requests to Boettcher to do field appraisal work. Boettcher refused the requests and allowed only those personnel specifically employed to do such work to go out into the field. The refusals came even though one of the deputy assessor positions had remained vacant since April 1976. No effort was made to fill that vacant position prior to mid-1979, despite the presence in the office of two female employees certified to do appraisal work. Sigurdson testified that Boettcher stated to her that field appraisal work was not women's work. Boettcher's stated reason for refusing Sigurdson's requests to do outside field work was that he did not like the "idea of sending ladies out with a car when it had snowed overnight." He also testified that field appraisal work was usually done in teams and that it was his opinion that it would present a bad public image for a woman and a man to perform outside field work as a team. The same view was expressed by one of the deputy assessors.

In spring 1979, another deputy assessor terminated employment with the county. Shortly thereafter, Boettcher held a meeting with office personnel at which he asked Sigurdson and two other women if they wanted to assume the computer work assignments of the departing deputy assessor. Sigurdson, referring to a previous occasion when she had been denied such an opportunity, declined Boettcher's request, stating, "Funny, I was never good enough to do that before." Sigurdson testified that at the same meeting Boettcher said that he intended to hire two additional men to do field appraisal work and that she

objected because there were already two women in the office who were qualified and willing to do the work. Boettcher then became angry and told her that she could leave if she did not like it.

Sigurdson testified that she did not know whether she had been fired. She did, however, become upset as a result of the meeting and went home. When she returned the next morning, she was told that Boettcher was away for the remainder of the week. Sigurdson then removed some personal effects from her desk and decided to take the balance of the week as vacation, without leaving a note informing Boettcher of her plans. When she returned to work the following Monday, her desk, typewriter, and telephone were gone and Boettcher contended that she had quit.

Sigurdson appealed to the county board for reinstatement to her position in the assessor's office. The record is not clear as to the ensuing events. After a few weeks, however, the Isanti County Attorney instructed Sigurdson to return to work. Upon her return on August 1, 1979, she was assigned to do field appraisal work but was not given a position as deputy assessor. In September, 1979, Boettcher issued a written reprimand to Sigurdson instructing her to put her complaints in writing. He testified that he issued the reprimand because Sigurdson had continually been asking him questions about why he was treating her differently. Sigurdson said the reprimand was issued because she complained when Boettcher refused, the day before a course began, to let her attend that course, which he had promised in April of that year she might attend.

During 1978 and 1979, the county contracted through the Minnesota Association of Counties to classify and evaluate all county employees for the purpose of establishing job classifications and salaries based upon tenure and job responsibilities. After she was assigned to do field appraisal work, Sigurdson was classified as a "property appraiser." A male co-worker who had been doing field appraisal work

since 1976 was classified as a "deputy assessor." Since 1979, the difference in annual salary between Sigurdson and the employee assigned the deputy assessor classification has been approximately $3,500 to $4,000.

Boettcher retired as county assessor in 1981. He was replaced by Mennenga, who was chosen for the position over five other finalists, one of whom was Sigurdson. In August, 1981, shortly after becoming county assessor, Mennenga considered recommending Sigurdson for promotion to deputy assessor. In fall 1981 he was named as a defendant in a complaint Sigurdson had filed with the Minnesota Human Rights Department. Thereafter, he ceased consideration of the promotion. Mennenga testified that his view changed because at a meeting with Sigurdson she indicated that she would follow only those policies of the department with which she agreed and that she would not make a commitment to support Mennenga's policies if she were named deputy assessor. At a subsequent meeting, however, she did agree to support Mennenga's policies, but she was never promoted to deputy assessor.

From that time forward, relations between Mennenga and Sigurdson deteriorated. Mennega told Sigurdson not to conduct appraisals in a particular section of the county because several taxpayers had requested an appraiser other than Sigurdson. Sigurdson believed the complaints were from relatives of former assessor Boettcher. After Mennenga's directive, however, a taxpayer in that section requested an appointment for Sigurdson to complete an appraisal started earlier. Sigurdson testified that she completed the appraisal in the belief that Mennenga's orders pertained only to new appraisal assignments. When she returned to the office, Mennenga accused her of intentionally disobeying his orders.

Later, Sigurdson received a reprimand for improper handling of an appraisal. Two residents of the county claimed that Sigurdson had entered their home without permission. Sigurdson claimed that she had opened the door to the residence in an effort to get the attention of one of the residents but had not actually entered the home. Sigurdson's actions violated rules of the assessor's office.

As a consequence of the complaint, Sigurdson was told to remain at her desk and read the assessor's manual until she felt she could properly do her job and could understand the policies for conducting appraisal work. She was instructed to leave all office duties to others and to concentrate solely on reviewing the manual. Sigurdson was to contact Mennenga when she had completed her review of the manual. Sigurdson testified that she felt she had understood the policies in the manual all along and that she did not need to be isolated from her normal daily duties in order to remain at her desk and review the assessor's manual. She never informed Mennenga that she had completed her review of the manual. As a result, her assignment continued for over three weeks, during which time she received a second written reprimand for assisting a co-worker in an office task when she was supposed to have been reviewing the manual.

Plaintiff claims that since 1981 she has been subject to continual harassment by Mennenga. She testified that he criticized her for coming in late to work when the office atmosphere regarding promptness was generally lax. Testimony from a co-worker, however, indicated that Mennenga told all personnel to start getting to work on time.

Sigurdson also testified that she was denied the opportunity to take a narrative writing course in 1983. The purpose of the course was to prepare persons for writing a paper that must be submitted to the state to achieve a higher level of certification as an accredited assessor. Sigurdson admitted that she had been allowed to take numerous other courses at county expense and on county time during her tenure of employment. Mennenga had previously allowed a male deputy assessor in the office to take the narrative writing course. As a condition of taking the course, he had re-

quired that the employee complete the accreditation paper within 90 days. The employee had previously taken the writing course and had, at that time, completed most of the approximately 200 hours of work necessary to produce the paper. Mennenga initially refused Sigurdson's request to take the writing course, saying that there was no money in the budget to cover the cost of the course. Later, he offered to allow her to take the course if she too would commit to completion of the paper within 90 days. Since she had not started the paper, the 90-day time limit was impossible, and she refused his offer. Finally, Mennenga said she could take the course if she would commit to some schedule for completion of the paper. At this point, however, Sigurdson was unwilling to make a commitment.

Another incident of claimed harassment involved a medical leave Sigurdson took after undergoing surgery. In fall 1983, when Sigurdson was recovering from bunion surgery that resulted in her inability to do field appraisal work, Mennenga refused to allow her to return to work until she was capable of performing field appraisal duties. As a result, Sigurdson was forced to take an unpaid leave of absence. Testimony indicated that she might have been able to perform her in-office duties during this time. Her doctor, however, had certified her as "totally disabled" for walking.

Sigurdson's complaint to the Human Rights Department was dismissed in February 1982 for lack of probable cause. After the denial of her appeal, Sigurdson brought a civil action under the Minnesota Human Rights Act against respondents. At trial, the court empaneled an advisory jury pursuant to Minn.R.Civ.P. 39.02. After being instructed as to the framework set forth in *McDonnell Douglas Corp.* for analyzing employment discrimination cases, the advisory jury found that respondents had discriminated against Sigurdson on the basis of sex but that they had not discriminated against her in reprisal for bringing the charges of discrimination. The trial court rejected the findings of sex discrimination by the advisory jury.

I

The Minnesota Human Rights Act provides that it is an unfair employment practice for an employer because of sex "(a) to refuse to hire or to maintain a system of employment which unreasonably excludes a person from seeking employment; or * * (c) to discriminate against a person with respect to his hire, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn.Stat. § 363.03, subd. 1(2) (1984). The Act also provides that it is an unfair discriminatory practice to act in reprisal against an employee who brings a charge of employment discrimination. Minn.Stat. § 363.03, subd. 7 (1984). In analyzing cases brought under the Act, we have often applied principles developed in the adjudication of claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (1982), because of the substantial similarities between the two statutes. *Hubbard*, 330 N.W.2d at 441.

The claim of the plaintiff in this case is one of "disparate treatment" based on gender.[1] The United States Supreme Court in *McDonnell Douglas Corp. v. Green* established a three-part analysis for adjudicating disparate treatment claims in Title VII actions. We adopted this analysis for disparate treatment claims brought under the

1. The United States Supreme Court has defined two basic types of employment discrimination cases: "disparate treatment" cases and "disparate impact" cases. Disparate treatment cases involve allegations that the employer has treated "some people less favorably than others because of their race, color, religion, sex, or national origin." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 336 n. 15, 97 S.Ct. at 1854 n. 15. Plaintiff's claim is one of disparate treatment because she claims that the county assessor's office has treated her less favorably because of her gender.

Minnesota Human Rights Act in *Danz v. Jones*, 263 N.W.2d 395, and have followed it in subsequent cases. *See, e.g., Hubbard*, 330 N.W.2d 428; *Kaster v. Independent School District No. 625*, 284 N.W.2d 362 (Minn.1979).

The *McDonnell Douglas* analysis consists of a prima facie case, an answer, and a rebuttal. First, the plaintiff must present a prima facie case of discrimination by a preponderance of the evidence. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). This requires the plaintiff to present proof of discriminatory motive. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). A prima facie case may be established by direct evidence of discriminatory motive, such as where an employer announces he will not consider females for positions. *Hardin v. Stynchcomb*, 691 F.2d 1364 (11th Cir.1982). For those cases in which such direct evidence is not available, the Supreme Court, in *McDonnell Douglas*, articulated an alternative means by which discriminatory motive can be indirectly inferred. 411 U.S. at 802, 93 S.Ct. at 1824. The specific elements of the *McDonnell Douglas* court's formulation of the plaintiff's prima facie case, however, must be modified for varying factual patterns and employment contexts. *Hubbard*, 330 N.W.2d at 442.

■ In the present case, Sigurdson claims that she was discriminated against in terms of employment opportunities, educational training, promotional opportunities, and wages. A generalized formulation of the *McDonnell Douglas* prima facie case applicable to cover the claims presented by this plaintiff would be that: (1) plaintiff is a member of a protected group; (2) plaintiff sought and qualified for opportunities that the employer was making available to others; (3) plaintiff, despite her qualifications, was denied the opportunities; and (4) after plaintiff was denied, the opportunities remained available or were given to other persons with plaintiff's qualifications.

■ If the plaintiff is successful in establishing a prima facie case, the second step in the *McDonnell Douglas* analysis creates a presumption that the employer unlawfully discriminated against the employee, and the burden of production shifts to the employer to present evidence of some legitimate, non-discriminatory reason for its actions.[2] *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. At this stage of analysis, the trial court should look for evidence presented by the employer that its actions were related to some legitimate business purpose. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The court should evaluate the sufficiency of the employer's evidence by the extent to which the evidence "serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

If the employer succeeds in carrying its burden of production, the third step of the *McDonnell Douglas* analysis requires the plaintiff, in order to prevail, to show that the reason or justification stated by the employer is actually a pretext for discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. At this stage, the plaintiff has the burden of persuading the court by a preponderance of the evidence that the employer intentionally discriminated against her. *Id.* The plaintiff may sustain this burden "either directly by persuading the court that a discriminatory reason likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

---

**2.** The ultimate burden of persuasion, however, never shifts, resting at all times upon the plain-

tiff. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

Sigurdson argues that the trial court did not adhere to the *McDonnell Douglas* analysis in reaching its judgment. It is clear that the trial court did not explicitly apply this analysis. Respondents argue, however, that the court implicitly recognized and applied the *McDonnell Douglas* analysis. The trial court was apparently aware of the applicability of *McDonnell Douglas* because it instructed the advisory jury on the respective burdens of persuasion and production necessary in that analysis.

The conclusion that the court actually applied the appropriate analysis in making its findings and conclusions, however, is far from clear. The trial court does not mention in its findings of fact the seemingly discriminatory statements by Boettcher that he did not like to send women out to do field work and that assessing was not women's work. These statements, which were not denied at trial, would appear to indicate that plaintiff had established a prima facie case with direct evidence of discriminatory motive. Also, the trial court makes no mention, even implicitly, of the four elements of the *McDonnell Douglas* prima facie case utilizing indirect or circumstantial evidence of discriminatory motive. These omissions become particularly troublesome when combined with the absence of specific findings that respondents submitted appropriate rebuttal evidence. It is simply not clear from the trial court's findings and conclusions that the court correctly applied the law regarding a plaintiff's prima facie case and applied the appropriate burdens of persuasion and production.[3]

As this case illustrates, lack of explicit application of the *McDonnell Douglas* analysis can present significant problems on review. Employment discrimination cases often involve intricate factual issues in which only the trial court, with its opportunity to observe the witnesses firsthand, can meaningfully assess the weight and credibility of the evidence. We have traditionally accorded great deference to the trial court in making findings of fact, recognizing that much must necessarily be left to its sound judgment and discretion because it has the advantages of fully hearing the testimony and acquiring a thorough familiarity with all the circumstances of the case. *Caroga Realty Co. v. Tapper*, 274 Minn. 164, 170, 143 N.W.2d 215, 220 (1966). An appellate court cannot judge the credibility of a witness or the weight, if any, to be given to testimony. *Caroga Realty, Id.* at 176, 143 N.W.2d at 224; *Hamilton v. Boyce*, 234 Minn. 290, 295, 48 N.W.2d 172, 175 (1951). Because of the significance of factual issues in employment discrimination cases and the attendant deference that must be accorded trial courts in making their determinations on these issues, it is important that the basis for the court's decision be set forth clearly and explicitly so that an appellate court can conduct effective and meaningful review.[4] *Cf. Rosenfeld v. Rosenfeld*, 311 Minn. 76, 82, 249 N.W.2d 168, 171 (1976) (to facilitate effective review, basis for court's decision must be set forth with particularity in custody matter and in domestic relation cases). Thus, we hold that in employment discrimination cases involving claims of disparate treatment and brought under the Minnesota Human Rights Act, the trial court, in making its findings of fact and conclusions of law, must explicitly apply the three-step *McDonnell Douglas* analysis.

Our holding does not require the trial court to rigidly and mechanically apply a *McDonnell Douglas* type analysis. As the

---

**3.** It is noteworthy that the advisory jury, which had been explicitly instructed on the application of the *McDonnell Douglas* analysis to the case, concluded that the plaintiff had been the victim of discrimination.

**4.** In *Moylan v. Moylan*, 384 N.W.2d 859, 865 (Minn.1986), we remanded for reconsideration and express findings by the trial court, stating,

"While we agree that there are occasions where an appellate court can find support for a trial court's decision by an independent review of the record, *see Bowman v. Brooklyn Pet Hospital*, 311 Minn. 526, 247 N.W.2d 424 (1976), such action is improper where, as here, it is unclear whether the trial court considered the factors expressly mandated by the legislature."

United States Supreme Court has indicated in regard to Title VII cases, the three-part analysis is merely a tool that provides "a sensible, orderly way to evaluate the evidence." *Furnco Construction*, 438 U.S. at 577, 98 S.Ct. at 2949. We require trial courts to make their use of the analysis explicit in order to facilitate appellate review.

The present case demonstrates the importance of explicit application of the analysis. We have here what appears to be a prima facie case of discrimination in which a six-person advisory jury, after having the opportunity to observe the witnesses and consider the testimony, concluded that there was in fact discrimination by the county against plaintiff. The trial court judge, on the other hand, having the same opportunity, concluded there was no discrimination. On appeal, two members of the appellate court, having only the bare record to consider, concluded the trial court decision was correct. A third member, reviewing the same record, concluded the trial court's findings were clearly erroneous. That responsible and intelligent persons, after careful consideration of the evidence presented, can come to diametrically opposed conclusions on the ultimate issue, clearly indicates the necessity of an explicit understanding of the analysis by which the trial court reached its decision. Only in this way can we meaningfully assess whether the law, including the appropriate burdens of production and persuasion, has been correctly applied to the facts. For this reason, we reverse the judgment of the court of appeals on this issue, vacate the trial court's judgment and remand for new findings and conclusions.

## II

We need not await the trial court's decision on remand, however, to determine the issue of the award of attorney fees to the county. The trial court awarded attorney fees to the county pursuant to Minn. Stat. § 363.14, subd. 3 (1984), which provides: "In any action or proceeding brought pursuant to this section the court, in its discretion, may allow the prevailing party * * * a reasonable attorney's fee as part of the costs." The court of appeals reversed the award. In *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the United States Supreme Court considered a statutory provision of Title VII of the Civil Rights Act of 1964, which is virtually identical to section 363.14, subd. 3. *See* 42 U.S.C. § 2000a–3(b) (1982). *Christianburg Garment*, like the present case, involved an award of attorney fees to a successful defendant in an employment discrimination action. The Supreme Court rejected an argument that attorney fees should be awarded to successful defendants only where the suit was motivated by bad faith. 434 U.S. at 419, 98 S.Ct. at 699. The Court also rejected the view that the award of attorney fees to prevailing defendants should be based on the same criteria as an award to prevailing plaintiffs. *Id.* Instead, the Court held: "[A] district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* at 421, 98 S.Ct. at 700.

Policy reasons support adoption of the federal standard for awarding attorney fees in cases brought under the Minnesota Human Rights Act. An obvious reason for enactment of subdivision 3 of section 363.-14 was to encourage victims of discrimination to bring suit, particularly where the relief sought is not a large money judgment, and to make legal counsel available in these cases. Making awards of attorney fees equally available to prevailing defendants would likely produce the reverse of the intended effect. Victims with legitimate cases would be discouraged from filing suit, fearing that if they did not prevail, they might be liable for substantial attorney fees incurred by a defendant. Moreover, the typically substantial difference in resources between plaintiffs and defendants in employment discrimination cases supports the conclusion that awards of at-

torney fees should not be available to prevailing defendants on the same basis as to prevailing plaintiffs. We hold, therefore, that a trial court may, in its discretion, award attorney fees to a prevailing defendant, pursuant to section 363.14, subd. 3, only upon a finding that the employee's action was frivolous, unreasonable, or without foundation, or was brought in bad faith.

In the present case, regardless of the decision of the trial court on remand, the standard adopted today requires reversing the trial court's award of attorney fees. There is no indication in the trial court's findings of fact or conclusions of law or in the record suggesting that plaintiff's claim was without foundation or that it was brought frivolously. Moreover, that the advisory jury concluded there was discrimination against plaintiff suggests some merit to the claim. We affirm the court of appeals with regard to the award of attorney fees.

Affirmed in part, reversed in part, and remanded.

YETKA, J., concurs in part, dissents in part.

KELLEY, J., took no part in the consideration or decision of this case.

YETKA, Justice (concurring in part and dissenting in part).

I concur in part and dissent in part.

I concur in that portion of the majority opinion which reverses the award of attorney fees.

I dissent from that portion of the opinion which remands for specific findings under the *McDonnell-Douglas* analysis. At some point, litigation must come to an end. In this case, a remand will do the appellant no good because the result will be the same. The trial court did make specific findings even though it did not spell them out in the manner that this court might like to see. The Department of Human Rights found no discrimination nor did the trial court or the court of appeals. What purpose would be served by sending it back to require the

trial court to redraft its findings all over again? We should affirm this case, but warn that all findings in future employment discrimination cases are to be clearly set forth according to the *McDonnell-Douglas* analysis.

I would affirm the court of appeals on the discrimination issue and reverse the award of attorney fees.