**STATE of Minnesota, by Jayne B. KHALIFA, Acting Commissioner, Department of Human Rights, Respondent,**

v.

**HENNEPIN COUNTY, Appellant.**

No. C6–87–1872.

Court of Appeals of Minnesota.

March 8, 1988.

Review Denied May 4, 1988.

Reconsideration of Denial of Review Denied May 25, 1988.

Hubert H. Humphrey, III, Atty. Gen., Nancy J. Leppink, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Thomas L. Johnson, Hennepin Co. Atty., Janeen E. Rosas, Asst. Co. Atty., Minneapolis, for appellant.

Heard, considered and decided by HUSPENI, P.J., and PARKER and LOMMEN,* JJ.

## OPINION

HUSPENI, Judge.

Mark Barta, the charging party, applied to Hennepin County, appellant, for the position of correctional officer at the Hennepin County Adult Correctional Facility. Barta was offered a position on the condition he passed a physical examination. He accepted this condition. Appellant later withdrew the employment offer on the basis that Barta failed to pass the medical examination. Barta filed a charge with the Minnesota Department of Human Rights alleging disability discrimination. An administrative law judge found appellant discriminated against Barta on the basis of disability and ordered appellant to pay damages, medical costs, attorney fees and a penalty. We reverse.

## FACTS

In August of 1982, Mark Barta was involved in a motor vehicle accident in which he sustained spinal injuries. He was hospitalized for one hundred days during which time he underwent surgery. As a result of his injuries, Barta has a limp in his left leg caused by muscle weakness, and for which he wears a ninety-degree, twelve inch, plastic brace.

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

At the date of the accident, Barta was a student at the University of Wisconsin where he majored in criminal justice. After his recovery from surgery, Barta was concerned that he would be unable to work as a law enforcement officer and changed the emphasis of his studies to corrections. He completed his university education in December of 1985. At the hearing before the administrative law judge, Barta testified that his career goal was to attain a supervisory or administrative position in corrections.

Barta was employed in various voluntary and part-time positions from June of 1983 through June of 1985. He then obtained a permanent position as a chemical dependency counselor with Olmsted County Department of Social Services which position he occupied at the date of the hearing.

In October of 1984, Barta applied to the Hennepin County Personnel Department for a position of a correctional officer. To qualify for consideration, he participated in an oral examination and appeared for a panel interview. Additionally, he signed a release permitting appellant to investigate his employment history, driving record, medical, academic and criminal history background. The record indicates that appellant never obtained Barta's medical records. Barta also completed the Multiphasic Personality Inventory test. He was notified that he scored 75.15 in the tests and was twenty-first on the list for the position of correctional officer.

On December 20, 1984, Barta was called to an interview for a full-time temporary position at the Hennepin County Adult Correctional Facility. He was interviewed by the supervisor of the men's section of the facility who had been employed there for more than seventeen years. Barta was not asked questions concerning his physical health at either the interview with the panel or with the supervisor.

The Adult Correctional Facility is a medium security facility with a maximum capacity of four hundred and ten inmates. It houses felons, gross misdemeanants and misdemeanants. There is a large minority population and the facility has problems with racial conflicts.

The facility operates on three shifts each day. Thirteen correctional officers serve on each of the first and second daytime shifts; six officers serve on the night shift. Each correctional officer has a portable radio, some have handcuffs, but none of the officers carry weapons. The correctional officers vary in age from those in their twenties to those who are over fifty years of age. More senior officers have less contact with the inmates than do the younger officers.

The job description for the position indicates that a correctional officer:

Enforces appropriate Minnesota Statutes relating to the confinement of prisoners; controls residents from stations or by patrolling in cell blocks, yard, grounds, corridors, dormitories, or work areas; escorts individual or groups of residents to work or other assignments or activities; maintains order and discipline at all times; may place inmates in restraining devices; keeps continual count of residents assigned; assists in searching for escapees, their capture and return to the facility; inspects cells, recreation areas, grounds, work location, and other facilities for unauthorized objects or material, maintains and checks order, safety and the well-being of residents; searches residents; enforces rules of conduct, security, and labor standard * * *

Additionally, the correctional officer is required to carry out various clerical tasks such as maintaining records of resident funds, and various supervisory tasks such as overseeing residents using the laundry facilities. A statement of the necessary knowledge, abilities and skills is also set out in the job description. There is nothing in the job description which specifically indicates the required physical abilities of a correctional officer.

Several days after the job interview, Barta was offered and accepted the position of temporary full-time correctional officer. He was notified of his hours and salary, and that there was no guarantee of an offer of a permanent position. Later that

same day, the supervisor advised Barta he must submit to the pre-employment physical. These communications took place by telephone and there is no record of what was said.

During the physical, Barta filled out a form in which he disclosed the nature and extent of the injuries he received in the 1982 accident. The physician who examined Barta specializes in occupational medicine and has evaluated applicants for the job of correctional officer at the facility for ten years. Although the physician has not himself visited the facility, his staff has made reports to him of their visits. Barta's medical records were not before the physician. Consequently, Barta disclosed the fact that he had been injured in a motor vehicle accident and that he wore a brace. The physician checked the mobility of Barta's neck, arms and legs, and observed Barta walking without his brace. Neither X-rays, reflex tests nor a physical examination of Barta's leg was conducted. Appellant chose to conduct a medical examination of prospective employees rather than conduct strength and agility tests; therefore, no such tests were conducted. The physical examination took approximately fifteen minutes, and upon its completion the physician advised Barta that he was not a good risk for the position of correctional officer because of his susceptibility to further injury.

The physical evaluation report indicates that Barta disclosed that his spine had been fractured in the cervical and thoracic areas. The physician noted that Barta had almost full mobility in his neck; that the damage to the thoracic vertebrae resulted in the Brown–Sequard's Syndrome with partial paralysis of the left lower leg, a loss of dorsiflexion in the left ankle, and with atrophy of the calf muscle. He stated that in his opinion, the nerve damage placed Barta at a greater risk of future injury and that although Barta was "suitable for work," he should not be "exposed to physical violence."

Upon receiving the physical evaluation report, the supervisor discussed Barta's condition with the physician. Subsequent-ly, the supervisor withdrew the job offer, whereupon Barta requested reconsideration after further evaluation of his physical condition by the Mayo Clinic.

Barta was then examined by Dr. Cabanella, an orthopedic surgeon at the Mayo Clinic, who concluded that Barta was able to work as a correctional officer.

After reviewing Cabanella's report, appellant's physician advised that his opinion remained unchanged. He stated that to expose Barta to the potential hazards of the position of correctional officer was neither in the best interests of the Adult Correctional Facility nor Barta. Barta was then notified that his position had been reviewed and that the original employment decision remained unchanged.

Subsequently, Barta filed a charge of discrimination with the Minnesota Department of Human Rights. At the hearing in April and May of 1987, the administrative law judge heard testimony from two physicians; Dr. Erickson, a specialist in occupational medicine, and Dr. Gregg who is Board certified in internal medicine and practices occupational medicine. The administrative law judge also heard testimony from Barta and from the supervisor who interviewed Barta for the job. Also received into evidence were Dr. Cabanella's deposition, the medical evaluation report by appellant's physician and over thirty-five exhibits and photographs.

The supervisor at the facility testified to the responsibilities of a correctional officer. He stated that when an officer needs assistance, a "111" call is put on the radio or the loudspeaker at which time each officer who is free to do so is expected to run fast to the officer needing assistance. The supervisor indicated that an officer responding to a "111" call might have to travel to any point on the eighty acre site; travel up and down the cell blocks which are only connected on the main floor; run up conventional and spiral staircases and negotiate a ladder to access the roof.

Dr. Erickson conducted an extensive review of relevant documents but did not examine Barta. Dr. Erickson concluded that appellant's medical examination was

standard and adequate to support the conclusions reached. He opined that Barta would be at greater risk of injury because of difficulties maneuvering, lack of muscle strength and restricted lifting, turning and pushing ability in the left foot.

Dr. Gregg testified that he conducted an extensive examination of Barta, an extensive review of the job description and the injury and "use of force" report records of the Adult Correctional Facility, and opined that if Barta were employed as a correctional officer, there would be a very low or negligible probability of injury to Barta or his co-employees due to his disability. Dr. Gregg concluded that Barta was able to navigate spiral stairs and move fast enough to arrive at a location to assist in an adequate time. Dr. Gregg also reviewed appellant's medical evaluation report and concluded that the physician did not have sufficient information to find that Barta was physically unsuited to the position.

The administrative law judge applied the test set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and determined that Barta had established a prima facie case of discrimination on the basis of his disability. The judge stated:

The only element of the *McDonnell Douglas* analysis which is in dispute is the question of whether or not Mr. Barta was qualified for the position of Correctional Officer at the ACF. * * *

* * * [T]he elements of a *prima facie* case are flexible and must be tailored to meet differing factual requirements. * * * The ultimate issue is whether there was intentional discrimination on the part of the employer. The central inquiry in evaluating whether the charging party has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference, that is a rebuttable presumption, that the basis of an employment-related decision was an illegal criterion. * * * [I]n this case speed in running or climbing were not specifically advertised as job qualifications. * * *

* * * * * *

It is properly concluded, based upon this record, and keeping in mind that the *McDonnell Douglas* formula is intended to be flexible, that Mr. Barta met the minimum qualifications for the position of Correctional Officer. It is clear that apart from his disability he would have been hired by [ACF]. His training and experience were satisfactory. Beyond that, the factual findings established in this record concerning the nature of the disability and the requirements of the job show that he met the *Minimum* qualifications for the position. What is disputed by [appellant] is whether or not he can run fast enough to respond to emergencies and whether he can defend himself adequately in an altercation. These are closer to being considerations of how effectively the Charging Party can do his job. They are not considerations which obviously render the Charging Party unqualified for the purpose of a *McDonnell Douglas* analysis. They are factors which are more properly considered under the serious threat defense or the *bona fide* occupational qualification (BFOQ) defense which are advanced by [appellant] in this case. * * * This conclusion seems to be consistent with the Court of Appeals decision in *Metropolitan Airport Commission, supra,* where the court found the maintenance worker applicant to be minimally qualified despite a back disability, but upheld the serious threat defense of the employer.

* * * * * *

* * * [A]ppellant has essentially admitted that its refusal to hire was due to Mr. Barta's disability and the question to be determined is whether or not this discrimination is legal based upon a serious threat or BFOQ defense.

The administrative law judge determined that appellant had failed to establish either the serious threat or the bona fide occupational qualification defenses, and that appellant had unlawfully discriminated against Barta. Appellant was ordered to

pay to Barta compensatory damages of $6,173.07 plus $783.38 in interest; $2,500 damages for mental anguish and suffering; $399.45 for medical fees; and $149.00 for attorney fees. In addition, appellant was ordered to pay a $3,000.00 penalty to the state. Barta did not request that the job offer be reinstated.

Appellant requests that the order of the administrative law judge be reversed; and in the event the finding of discrimination is affirmed, that the award of damages for mental anguish and suffering and the imposition of the penalty be reversed.

## ISSUE

Did the administrative law judge err in determining that Barta had established a prima facie case of employment discrimination based upon his disability?

## ANALYSIS

Under Minn.Stat. § 14.69 (1982) the reviewing court may reverse the decision of an administrative law judge on the basis that it prejudices appellant's substantial rights because the decision is:

(a) In violation of Constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

*Id.* The decision may be reversed or modified if the record indicates that the decision is not supported by substantial evidence. *Taylor v. Beltrami Elec. Co-op, Inc.*, 319 N.W.2d 52, 56 (Minn.1982). The findings must be viewed in the light most favorable to the decision and cannot be disturbed where the evidence reasonably supports them. *Booher v. Transport Clearings of Twin Cities, Inc.*, 260 N.W.2d 181, 183 (Minn.1977). Where the administrative law judge engaged in reasoned decision making, a reviewing court must affirm even though it may have reached a differ-

ent conclusion. *Application of Larson,* 350 N.W.2d 363, 368 (Minn.1984).

The Minnesota Human Rights Act, Minn. Stat. § 363.03 (1986), provides in relevant part:

Subdivision 1. *Employment.* Except when based on a bona fide occupational qualification, it is unfair employment practice:

\* \* \* \* \* \*

(2) For an employer, because of \* \* \* disability, \* \* \*,

(a) to refuse to hire or maintain a system of employment which unreasonably excludes a person seeking employment;

\* \* \* \* \* \*

*Id.,* subd. 1(2)(a). The statute defines the term "disability" as:

[A]ny condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical \* \* \* impairment which substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment.

Minn.Stat. § 363.01, subd. 25. The administrative law judge's finding that Barta is "disabled" within the meaning of the statute is not disputed on appeal.

The administrative law judge then applied the *McDonnell Douglas* analysis adopted by the Minnesota Supreme Court in *Danz v. Jones,* 263 N.W.2d 395, 399 (Minn.1978); *see also Sigurdson v. Isanti County,* 386 N.W.2d 715, 720–21 (Minn. 1986). The *Sigurdson* court stated:

The *McDonnell Douglas* analysis consists of a prima facie case, an answer, and a rebuttal. First, the plaintiff must present a prima facie case of discrimination by a preponderance of the evidence. This requires the plaintiff to present proof of discriminatory motive. A prima facie case may be established by direct evidence of discriminatory motive, such as where an employer announced he will not consider females for positions. For those cases in which such direct evidence is not available, the Supreme Court, in

*McDonnell Douglas,* articulated an alternative means by which discriminatory motive can be inferred. The specific elements of the *McDonnell Douglas* court's formulation of the plaintiff's prima facie case, however, must be modified for varying factual patterns and employment contexts.

*Sigurdson* at 720 (citations omitted). The *Sigurdson* court suggested a generalized formulation of the *McDonnell Douglas* prima facie case which if applied in this situation provides that:

(1) Barta must establish he is a member of a protected group;

(2) Barta must show that he sought and qualified for opportunities that the employer was making available to others;

(3) Barta must show that despite his qualifications he was denied the opportunities; and

(4) after Barta was denied, the opportunities remained available or were given to other persons with [Barta's] qualifications.

*Sigurdson* at 720. Only when the prima facie case is established should the administrative law judge proceed to the next stage of the analysis. The second step in the *McDonnell Douglas* analysis creates a presumption that the employer unlawfully discriminated against the employee, and the burden of production shifts to the employer to present evidence of some legitimate, nondiscriminatory reason for its actions. *Id.* If the employer succeeds in carrying its burden of production, the plaintiff may only prevail by showing in the third step of the *McDonnell Douglas* analysis that the justification given by the employer is actually a pretext for discrimination. *Id.*

The only issue raised on appeal in connection with establishment of a prima facie case is appellant's allegation that the administrative law judge erred in determining Barta had established that he met the qualifications for the job of correctional officer.

■ For the purposes of establishing a prima facie case, Barta need only show that he met the minimum objective qualifications for the job. *Legrand v. Trustees of University of Arkansas,* 821 F.2d 478, 481

(8th Cir.1987). It is not disputed that Barta met the academic requirements for the job and that he satisfactorily passed the interviews and required tests. However, appellant maintains that Barta did not meet the minimum objective qualifications because he cannot run fast enough to respond to an emergency and cannot effectively defend himself or others during altercations with inmates. The administrative law judge found that the job description did not indicate that these items were minimum qualifications for the position. Furthermore, the administrative law judge determined that Barta's ability to run and defend himself were not proper considerations in establishing the prima facie case and should be considered "under the serious threat defense or the *bona fide* occupational qualification defense." We cannot agree with the determination of the administrative law judge and find his reliance upon the decision in *State v. Metropolitan Airport Commission,* 358 N.W.2d 432 (Minn.Ct.App.1984) to be misplaced. In that case the issue to be determined concerned the establishment of the serious threat defense, which issue would be addressed in the second stage of the *McDonnell Douglas* analysis; the opinion indicates that there was no challenge to the determination that a prima facie case of unlawful discrimination had been established.

■ While the job description here did not specifically require that a correctional officer be able to "run fast enough to respond to emergencies" and to "defend himself adequately in an altercation," implicit in this description is the recognition that a correctional officer must meet a high standard of physical agility and be able to survive violent attacks to his person. It is also undisputed and important that Barta was offered the position of correctional officer conditioned on his passing the pre-employment physical. Barta did not pass the physical. Not only was appellant's physician, who had many years of experience in evaluating applicants for the position of correctional officer, qualified and competent to conduct the physical examination,

but appellant's reliance upon its physician's recommendation was reasonable. To suggest that the pre-employment physical was not a part of the minimum objective qualifications for a job which may involve physical violence is to reduce the requirement of passing the physical to a mere formality. Barta was not applying for a clerical position but for a position which required the employee to "control," "search" and restrain inmates and to maintain order and discipline "at all times." Appellant concedes that Barta was not hired because he was an unsuitable candidate for exposure to violence. After reconsideration in the light of Dr. Cabanella's report, appellant reaffirmed its decision not to hire Barta. Appellant's reliance upon its own physician's recommendation was reasonable and its conduct does not give rise to a prima facie case of unlawful discrimination. The detailed and competent testimony of Drs. Erickson and Gregg was received after the fact and was not before appellant when making the decision not to hire Barta. Their testimony was, therefore, appropriate only in the event that the second and third steps of the *McDonnell Douglas* analysis were reached.

The record contains nothing which indicates to us that appellant was shown to have a discriminatory motive when declining to hire Barta. Because we find that Barta did not establish a prima facie case of unlawful discrimination, we need not address the other issues raised by appellant.

## DECISION

Barta did not establish a prima facie case of employment discrimination based upon his disability because he did not meet the minimum objective qualifications for the position of correctional officer.

Reversed.