Stuart SIGURDSON, Appellant,

v.

CARL BOLANDER & SONS, CO., Respondent.

No. C4–93–1555.

Court of Appeals of Minnesota.

Feb. 1, 1994.

Review Granted March 31, 1994.

---

David A. Singer, Frank Madden & Associates, Plymouth, for appellant.

Barbara Jean D'Aquila, Cosgrove, Flynn, Gaskins & O'Connor, Minneapolis, for respondent.

Considered and decided by FORSBERG, P.J., and LANSING and NORTON, JJ.

## OPINION

NORTON, Judge.

In this disability and age discrimination case, appellant Stuart Sigurdson challenges summary judgment against him. On appeal, he argues that the district court failed to view the evidence in his favor, misinterpreted the law on evaluating evidence of disability discrimination, erred in concluding that Sigurdson had not established a prima facie case of age discrimination, and abused its discretion when it denied Sigurdson's motion to submit a late affidavit. Although summary judgment was proper on the age discrimination claim, the trial court erred in finding no fact issue regarding pretext in the disability discrimination claim. Sigurdson had direct evidence of pretext in the record that created a fact issue for trial and precluded summary judgment. We affirm in part, reverse in part, and remand.

## FACTS

On January 8, 1990, Sigurdson applied for a job with respondent Carl Bolander & Sons, Co. (Bolander), having heard of a job opening from a friend who worked as a mechanic there. Sigurdson had 27 years of work experience as a mechanic for various companies. Sigurdson filled out an application and, although he had no appointment, met with Thomas Slaughter, equipment superintendent and supervisor of the mechanics.

During the interview, Slaughter read over Sigurdson's application and asked Sigurdson about his engine rebuilding experience which Sigurdson had mentioned in his application. Sigurdson testified at deposition that Slaughter "told me I had good qualifications and that he would recommend me for the job." Sigurdson said Slaughter told him the rate of pay for the job would be $11.75 per hour plus $1.00 to be put into a pension, that Bolander had other truck mechanics, and that "there would not be much" overtime.

Sigurdson then told Slaughter that he has diabetes. When asked at his deposition why he volunteered this information, Sigurdson explained that he always told his employers that he has diabetes and he felt that Bolander was going to hire him. He testified that after he mentioned he was a diabetic, Slaughter told him that the mechanic who had left the position was a diabetic, that he passed out on the job, and that Bolander had to call an ambulance. According to Sigurdson, Slaughter then said:

Just that, you know—that he didn't—because of my diabetes he didn't know if they'd hire me or not and they'd have to check with the attorney.

Approximately a week later, Sigurdson called Slaughter and asked if he had talked to the attorney yet. Slaughter said, "no," and asked Sigurdson to speak to the attorney himself because Slaughter was going on vacation. Sigurdson testified that he never

discussed with Slaughter why he did not get the job.

With regard to Sigurdson's application, Slaughter remarked that Sigurdson had not worked in the trade for a while and that his only strong point appeared to be engine rebuilding. Slaughter denied that he told Sigurdson that he thought he had good qualifications, although he admitted he might have told him he had good qualifications for engine work. Slaughter further denied expressing concern about Sigurdson's diabetes as it related to his employment chances. Slaughter explained that he did not consider it important that Sigurdson took insulin and did not consider his diabetes to be a disqualification for the job. Slaughter also denied saying anything to Sigurdson about a diabetic coworker going into insulin reaction and was not aware of that ever happening at Bolander.

Slaughter testified that he contacted the Northeast Metro Technical College (Vo–Tech) to recruit a truck mechanic when the position initially opened up in late December 1989. Thomas Johnstone, director of the Vo–Tech, testified by affidavit that Slaughter did not specify any desirable age nor ask about disabilities. Johnstone recommended Jeffrey Schertz as a good candidate for the truck mechanic position.

Robert Powers, Bolander's shop foreman, interviewed Schertz. Schertz impressed Powers because he had Vo–Tech training, was eager to improve his skills by further education, was very alert, articulated his goals for self improvement and advancement, volunteered information, and asked thoughtful, pertinent questions. Also, Schertz mentioned during the interview that he was interested in being involved in the state's apprentice program. Powers stated at his deposition that Bolander liked employees with less hands-on experience because they were not set in their ways. Sigurdson's attorney then asked him:

So in other words, you would prefer to have somebody younger that's less ingrained in habits of working somewhere else?

Powers replied, "yes;" he said he and Slaughter had discussed this issue. Powers later explained in an affidavit that, in his opinion, a "young mechanic" is someone who was relatively new in the field, not necessarily referring to age. In addition, Slaughter stated at his deposition that Schertz was better qualified because they "could mold him to our specifications" and that Sigurdson was not as up to date on current products. When Slaughter came back from vacation, he told Powers that if he was impressed with Schertz, "get him on board." Slaughter admitted that he did not talk to Powers about Sigurdson's application even though Sigurdson applied before Schertz' interview.

Schertz stated in his affidavit that Powers told him during his interview that the job would require overtime and was slated as a 45 hour-a-week position. Schertz further testified that when he began work he put in a significant amount of overtime, even beyond the 45 hours a week because the trucks and trailers had not been well maintained before he started working there.

Sigurdson followed up his job application by speaking with Bolander's in-house counsel, Steve Vodonik. Sigurdson testified that the following exchange occurred:

Q. What did you say to him?

A. I asked him about the job, if they'd come to a decision on it.

Q. And what did he say?

A. He said that basically that they had. And I asked him—he said because I'm a diabetic—and he said, yes, the owner's wife has got diabetes and they didn't feel they wanted to hire a diabetic.

Q. So in the phone conversation with Mr. Vodonik you asked him about the job and he told you that they'd come to a decision to hire someone else, correct?

A. No. He never said—I don't recall that he said they'd come to a decision to hire somebody else.

Q. They'd just come to a decision not to hire you?

A. Yes.

Q. Okay. And then you asked him why, is that correct?

A. Yes.

Q. And he—you asked him if your diabetes was—why don't you tell me as best you can specifically how the conversation went. Who said what when?

A. I asked him if they'd made a decision on it and—and he said no. And I—I guess I asked him, you know, something about diabetes, you know, if that was the reason, and he said that he didn't, you know, want to—I don't know how to—he didn't really want to admit to that, but he said, yes. He says then that the owner's wife had diabetes and that they didn't feel they wanted to hire a diabetic.

Q. Did he say anything else to you?

A. No.

Vodonik testified that Sigurdson called him and expressed concern "about the fact that he felt that his employment was based more on his diabetes than on any qualifications he might have." Vodonik told him that was not true; he understood that Bolander had hired an apprentice. He also stated he never heard of a mechanic at Bolander ever having an insulin reaction. Vodonik denied telling Sigurdson that he was not hired because of his diabetes. In a letter to Sigurdson's attorney dated May 6, 1990, Vodonik said Bolander rejected Sigurdson because they hired someone involved in the state apprenticeship program, not because Sigurdson was a diabetic.

Sigurdson brought this action against Bolander alleging disability and age discrimination. The district court granted summary judgment to Bolander on both claims.

### ISSUES

I. Was summary judgment proper on:

A. the disability discrimination claim?

B. the age discrimination claim?

II. Did the trial court abuse its discretion when it denied appellant's motion to submit a late affidavit?

### ANALYSIS

 On appeal from summary judgment, this court must determine whether there are genuine issues of material fact and whether the trial court erred in its applica-

tion of the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). The moving party has the burden of proof on summary judgment; the court must view the evidence in the light most favorable to the party against whom the motion was granted. *State by Cooper v. Hennepin County,* 441 N.W.2d 106, 109 (Minn.1989).

> Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law.

Minn.R.Civ.P. 56.03.

As a preliminary matter, Sigurdson argues that the trial court failed to view the evidence in his favor. We agree. In the order granting summary judgment, the district court recited a list of "undisputed facts" in the record. Such an approach to the record upon motion for summary judgment was improper. The court's analysis suggests that it did not view the evidence in a light most favorable to Sigurdson. While undisputed facts may exist, the court should focus on whether any disputed facts exist for trial.

### I. Discrimination Claims

 Minnesota courts follow the three-step analysis for adjudicating discrimination claims that the United States Supreme Court first enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Danz v. Jones,* 263 N.W.2d 395, 399 (Minn.1978) (first adopting *McDonnell Douglas* test). In order to maintain a successful claim, the plaintiff must first establish a prima facie case of discrimination, after which the employer must present evidence of a legitimate nondiscriminatory reason for its actions. *Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986). If the employer shows that its actions were related to some legitimate business purpose, then the plaintiff must show the proffered reason was actually a pretext for discrimination. *Id.*

## A. Disability Discrimination Claim

### 1. *Prima Facie Case*

 Appellant alleges the trial court erred when it concluded that Sigurdson had failed to establish a prima facie case of disability discrimination. We agree. A plaintiff may establish a prima facie case of discrimination by providing direct evidence of discriminatory motive or, where direct evidence is not available, by setting out four factors that indirectly prove discrimination. *See Sigurdson,* 386 N.W.2d at 720.

In this case, Sigurdson presented direct evidence of discrimination. In his deposition and his answers to interrogatories, Sigurdson included the statements of Slaughter and Vodonik that they had not hired him because of his diabetes. According to Sigurdson, Slaughter said that, because of Sigurdson's diabetes, "he didn't know if they'd hire me or not and they'd have to check with the attorney [Vodonik]." Sigurdson testified that Vodonik admitted Bolander had not hired Sigurdson due to his diabetes; he said that the owner's wife had diabetes and "they didn't feel they wanted to hire a diabetic." This direct evidence is sufficient to establish Bolander's discriminatory motive in denying employment ·to Sigurdson. *See Sigurdson,* 386 N.W.2d at 720. These statements demonstrate that, in Bolander's opinion, Sigurdson's diabetes is a disqualifying characteristic for the job. *See Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d 1525, 1530 (11th Cir.1985) (where plaintiff presented evidence that employer commented on plaintiff's advancing age, indicated that he planned to hire younger employees, and stated "new blood" was needed, jury could find this direct evidence established plaintiff's prima facie case); *compare with Rutherford v. County of Kandiyohi,* 449 N.W.2d 457, 462 (Minn.App. 1989) (where termination letter failed to express that employee's schizophrenia was a disqualifying characteristic in and of itself, court found no direct evidence of discrimination), *pet. for rev. denied* (Minn. Feb. 28, 1990).

We realize that the district court did not refer to these two statements in its decision. Despite that fact, we will consider this evidence on appeal because both documents were in the court file when the district court heard and considered the motion for summary judgment. *See* Minn.R.Civ.App.P. 110.01 ("the papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases."); Minn.R.Civ.P. 56.03 (summary judgment shall be granted only if the district court record, including depositions and answers to interrogatories, shows that no genuine issue of material fact exists).

Bolander contends the direct evidence is "self-serving" and "inconsistent and equivocal." Those allegations, however, create a genuine issue of material fact for the jury to consider. *See McGrath v. TCF Bank Savings, fsb,* 509 N.W.2d 365 (Minn.1993) (when employer has legitimate reason for conduct, plaintiff may still prevail if the employer's illegitimate reason "more likely than not" led to the conduct; question would be for jury to consider). Sigurdson established a prima facie case by direct evidence.

 We note further that even if Sigurdson had not established a prima facie case by direct evidence of discrimination, he established a prima facie case indirectly by showing:

a. he was a member of a protected class;

b. he was qualified for the job;

c. he was not hired for the position; and

d. Bolander hired a nonmember of the protected class for the position.

*See Lindgren v. Harmon Glass Co.,* 489 N.W.2d 804, 808 (Minn.App.1992), *pet. for rev. denied* (Minn. Oct. 20, 1992). The trial court concluded that Sigurdson had failed to prove he was a member of the protected class. We disagree.

The Minnesota Human Rights Act (MHRA) prohibits· an employer from refusing to hire a person because of a disability. Minn.Stat. § 363.03, .subd. 1(2)(a) (Supp. 1989). The MHRA defines "disability" as:

any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an

impairment; or (3) is regarded as having such an impairment.

Minn.Stat. § 363.01, subd. 25 (Supp.1989).

Physical or mental impairment is defined as:

> any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculo-skeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine.

*Cooper*, 441 N.W.2d at 110 (quoting 45 C.F.R. § 84.3(j)(2)(i)(A) (1988)). Whether an impairment materially limits a major life activity is determined on a case-by-case basis. *Id.* at 111.

Bolander questions whether Sigurdson's diabetes "materially limits" his activities, and whether the major life activity must be working. Although one might assume that working is the relevant life activity in an employment discrimination claim, the Minnesota Supreme Court has defined "major life activities" as:

> functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

*Id.* (quoting 45 C.F.R. § 84.3(j)(2)(ii) (1988)). We do not read the MHRA or *Cooper* so narrowly as to limit major life activity to work alone. Sigurdson presented evidence that his diabetes affects his diet and ability to eat which, in turn, affects his general health and, ultimately, his ability to work. To control his diabetes, Sigurdson must take insulin shots at the same time every day. He must eat meals regularly or else run the risk of an insulin reaction in which he shakes, his face turns white, he breaks out in a sweat, his speech becomes abnormal, and he acts "goofy." Sigurdson testified that these insulin reactions do not occur "real often." If an insulin reaction "incapacitates" him, he will go to the doctor. Sigurdson testified that at least once his wife called an ambulance when he had an insulin reaction in his sleep. This evidence serves as a record of the impairment Sigurdson experiences as a result of his diabetes.

Sigurdson also makes a case for his disability under the MHRA when he argues that Bolander "regarded" him as having diabetes. *See* Minn.Stat. § 363.01, subd. 13(3) ("disabled person is any person who * * * is regarded as having such an impairment"). This category covers:

> those persons who do not in fact have the condition which they are perceived as having, as well as those persons whose mental or physical condition does not substantially limit their life activities and who thus are not technically within [the first prong] in the new definition. Members of both of these groups may be subjected to discrimination on the basis of their being regarded as handicapped.

*Cooper*, 441 N.W.2d at 112 (quoting S.Rep. No. 93–1297, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. and Ad.News 6373 at 6389–90). Here, Sigurdson claims Slaughter told him that "because of my diabetes he didn't know if they'd hire me" and that Vodonik told him "they didn't really want to hire a diabetic." These statements are evidence that Bolander perceived Sigurdson as possessing a disabling condition which materially limited his ability to work.

In *Cooper*, as in this case, the employer told the applicant, that he was not hired because of his vision and hearing problems. *Id.* at 108–09. The court determined that the applicant was not disabled simply because he had poor vision and did not possess the 20/20 vision required for the job. *Id.* at 112–13. The court then noted, "This case differs significantly from one involving a blind person or other individual whose visual problems are uncorrectable." *Id.* at 112. In this case, Sigurdson's diabetes is uncorrectable, although he can treat it with his daily insulin shots and by monitoring his diet. On this basis, we distinguish Sigurdson's diabetic disability from the visual disability the applicant claimed in *Cooper*.

Thus, the evidence that Sigurdson's diabetic condition constitutes a disability is sufficient to withstand summary judgment. His diabetes and need for insulin materially limits his major life activity of maintaining a proper diet, an activity that contributes to his

general health and capacity to function. Furthermore, Bolander perceived him as being disabled when they denied him a job because of his diabetes. Sigurdson demonstrated that he is a member of a protected class.

Sigurdson also established that he was qualified for the job of truck mechanic. *See Lindgren,* 489 N.W.2d at 808 (second prong of prima facie test). The evidence, viewed in a light most favorable to Sigurdson, shows that Sigurdson had 27 years of experience as a mechanic and that Slaughter told him he had good qualifications for the job. In addition, the parties agree that Bolander did not hire Sigurdson and did hire a nonmember of the protected class for the truck mechanic position. *See id.* (last two prongs of prima facie test). Thus, the record demonstrates that Sigurdson established a prima facie case by direct and indirect evidence.

2. *Legitimate Nondiscriminatory Reason*

■ Once Sigurdson established a prima facie case, Bolander had the burden of presenting a legitimate nondiscriminatory reason for its hiring decision. *See Rademacher v. FMC Corp.,* 431 N.W.2d 879, 882–83 (Minn.App.1988). Bolander said they hired Schertz because of his job qualifications and his participation in the apprenticeship program. On its face, this reason meets the test. *See Id.*

3. *Pretext*

■ The burden then shifted back to Sigurdson to show that Bolander's reasons were merely pretext for discrimination. *See Id.* at 883. As we have already discussed, Sigurdson presented direct evidence that Bolander's reasons were merely pretext. The comments Sigurdson submitted to the court demonstrated "that a discriminatory reason likely motivated" Bolander in its decision-making. *See Sigurdson,* 386 N.W.2d at 720 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). Thus, Sigurdson established a prima facie case and presented direct evidence of pretext. Summary judgment was inappropriate on Sigurdson's disability discrimination claim.

**B. Age Discrimination Claim**

■ Sigurdson contends the trial court erred in finding insufficient evidence of age discrimination. He alleges that Bolander's preference for recent Vo–Tech graduates has a disparate impact on older mechanics. We cannot agree.

> Claims of disparate impact involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by a business necessity. Proof of discriminatory motive, we have held, is not required under disparate-impact theory.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977) (quoted in *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 441 n. 12 (Minn. 1983)). Statistical evidence is commonly used in establishing a prima facie case of disparate impact. *Schlemmer v. Farmers Union Central Exch., Inc.,* 397 N.W.2d 903, 908 (Minn.App.1986).

Sigurdson produced no statistical evidence on the pool of applicants or on a systematic exclusion of older people. On the contrary, the evidence shows that Bolander employs several mechanics over the age of 40 and, in 1986, rehired a mechanic at the age of 57. Furthermore, the Vo–Tech graduates are not necessarily young; Schertz and Johnstone testified that the program includes students of various ages. Finally, the evidence that Sigurdson presented regarding prior applicants who were not hired was incomplete and lacked any explanation of its significance. *See Albertson v. FMC Corp.,* 437 N.W.2d 113, 116–17 (Minn.App.1989) (party presenting statistics must "demonstrate that the proffered conclusions are statistically significant"). Sigurdson failed to show that Bolander intentionally discriminated against him on the basis of age. Summary judgment was proper.

**II. Affidavit**

■ Sigurdson argues the trial court abused its discretion when it denied his motion to submit an affidavit after the hearing

on the summary judgment motion. We disagree.

 When it appears that a party opposing a summary judgment motion cannot present facts essential to its opposition, the court "may order a continuance to permit affidavits to be obtained." Minn.R.Civ.P. 56.06. The court's decision to extend procedural time limits is discretionary and will not be reversed unless the discretion has been abused. *Coller v. Guardian Angels Roman Catholic Church of Chaska*, 294 N.W.2d 712, 715 (Minn.1980).

The affidavit at issue would have been from Sigurdson's former supervisor who would have testified to Sigurdson's qualifications, commented on hiring "younger Vo-Tech graduates," and addressed job requirements of a truck mechanic. He requested extra time because the supervisor went out of town.

Sigurdson knew of the hearing date two-and-a-half months before the supervisor left for vacation. He had several opportunities before the last minute to request and retrieve the affidavit. Furthermore, the record does not show that the affidavit would have aided Sigurdson much in surviving summary judgment. The trial court did not abuse its discretion in denying Sigurdson extra time to file the affidavit.

## DECISION

Sigurdson established a prima facie case of disability discrimination by direct evidence. The two statements in the record demonstrate Bolander's discriminatory motive behind its hiring decision. Sigurdson also established a prima facie case indirectly by showing that his diabetes is a physical impairment that materially limits his major life activities. In response to Bolander's proferred business reason, Sigurdson presented direct evidence of pretext. Whether this direct evidence was the main reason for Bolander's decision is a question for the jury to determine. Summary judgment was improper on the disability discrimination claim. We remand for trial on that issue. The trial court did not err in granting summary judgment against Sigurdson on the age discrimination claim. The trial court did not abuse its discretion in denying Sigurdson's motion for extra time to file an affidavit.

**Affirmed in part, reversed in part, and remanded.**