STATE of Minnesota, by Stephen W.
COOPER, Commissioner, Dept. of
Human Rights, Relator,

v.

HENNEPIN COUNTY, Respondent.

No. C9–87–2434.

Court of Appeals of Minnesota.

June 7, 1988.

Review Granted Aug. 2, 1988.

Hubert H. Humphrey, III, Atty. Gen., Audrey A. Zibelman, Sp. Asst. Atty. Gen., St. Paul, for relator.

Thomas L. Johnson, Hennepin Co. Atty., Janeen E. Rosas, Asst. Co. Atty., Minneapolis, for respondent.

Heard, considered and decided by HUSPENI, P.J., and PARKER and MULALLY *, JJ.

## OPINION

HUSPENI, Judge.

The Minnesota Department of Human Rights, relator, brought a complaint alleging that Hennepin County, respondent, had discriminated against Allen Tervo on the basis of disability. Tervo was eliminated as a suitable candidate for the position of Detention Deputy because Tervo's vision was too poor. The administrative law judge (ALJ) dismissed the complaint on the basis of relator's failure to establish a prima facie case of disability based on discrimination. On appeal, relator challenges the ALJ's award of summary judgment to respondent. We affirm.

* Acting as judge of the Court of Appeals by ap-

## FACTS

In January 1984, Allen Tervo enrolled in a law enforcement program at the Minneapolis Community College. On February 21, 1984, he applied for the position of Detention Deputy with the Hennepin County Sheriff's Office.

The job description for the position of Detention Deputy stated the duties included:

> [C]arries out the statutory detention function of the Office of the Sheriff: fingerprints, books, secures and releases inmates. Supervises the custody of inmates; may run line-ups; may staff security control room; makes regular security checks; ensures inmates pre-trial rights; supervises visitation; arranges court appearances; verifies disposition of inmates returned from court; may transport inmates; responsible for searches as required; responds to emergency situations * * *.

The academic requirements for the position were stated as:

> Successful completion of two years of college or vocational technical coursework (with a GPA of 2.0 or higher on a 4.0 scale). An emphasis in a criminal justice field (i.e., police science, law enforcement, corrections) or a behavioral science field (i.e., sociology, psychology) is preferred. * * *

The job description did not indicate that an applicant must have 20/100 uncorrected vision.

Tervo's application indicated that he had a B.A. degree in Mass Communication and Psychology; and that from 1979 he had been employed at various times as a child care counselor, a truck driver and a human services technician.

Tervo was called for an interview and was informed that unqualified applicants would be screened out after each of the several stages in the application procedure which consisted of a written examination, separate oral and psychological interviews, a strength and agility test and, finally, a preemployment physical. Following com-

pointment pursuant to Minn. Const. art. 6, § 2.

pletion of the strength and agility test, the third stage in the procedure, Tervo was notified that he was one of thirty successful candidates out of nine hundred applicants.

Although Tervo was not offered employment, a preemployment physical examination was scheduled. As part of that examination, Tervo completed a five page medical history questionnaire in which he indicated that he wore glasses. On May 30, 1984, Tervo was given a vision test by Dr. Cohan, who determined that Tervo's uncorrected vision in each eye was 20/200. Dr. Cohan later submitted a preemployment medical evaluation report which stated:

> Physical and laboratory results show that the applicant does not meet the requirements of the Hennepin County Sheriff's Department because of distant vision not 20/100 uncorrected and high tone hearing loss [in the right] ear.

After receipt of the medical report, respondent notified Tervo that he had been eliminated from consideration for the position.

Tervo then filed a charge with relator alleging that respondent discriminated against him on the basis of disability when it denied him employment because he failed to meet the vision requirements and had high tone hearing loss in his right ear. On August 13, 1987, relator filed an amended complaint alleging in part:

> 12. Hennepin County discriminated against Allen Tervo on the basis of disability in violation of Minn.Stat. § 363.03, subd. 1(4)(a)(1984) when it required Tervo to submit to a preemployment physical examination before making him an offer of employment and when, before he was employed by Hennepin County, it required him to furnish information pertaining to disability.
> 13. Hennepin County discriminated against Allen Tervo on the basis of disability in violation of Minn.Stat., § 363.03 subd. 1(2)(a)(1984) when it refused to hire Tervo because of the results of his preemployment physical examination.
> 14. Hennepin County discriminated against Allen Tervo on the basis of disability in violation of Minn.Stat. § 363.03,

subd. 1(6)(1984) when it failed to make reasonable accommodation to Tervo's disability.

Respondent denied the allegations and asserted that Tervo "did not complete the selection process; specifically, the background investigation and the selection interview remained to be done." In June of 1987, respondent moved for summary judgment on the basis that Tervo was not a member of a protected class. Relator also moved for summary judgment.

The motions were considered in two separate hearings. On September 11, 1987, the ALJ granted partial summary judgment dismissing Tervo's allegations of discrimination on the basis of disability. The ALJ addressed the issue of the 20/100 uncorrected vision requirement, and incorporated into its memorandum the following statement made to respondent by Dr. Cohan several weeks after respondent had eliminated Tervo from the application procedure:

> The reason why law enforcement agencies of all types do set up a limit on uncorrected vision is the possibility that the Peace Officer may have to function without his glasses or contact lenses for various reasons. The glasses could be knocked off in a struggle with another individual, sometimes Peace Officers will remove their glasses when they enter a cell with a prisoner because of the possibility that in a struggle the glasses might break and cause damage to the eye, or perhaps the glasses could be taken from the Peace Officer and used as some type of a weapon, because broken glass is a sharp instrument. We set the standard that a Peace Officer would need 20/100 uncorrected in each eye because we felt that was the bare minimum that they could function and carry on their job. 20/100 is poor vision, and even at that level an individual would most likely have trouble reading normal signs, identifying someone and just difficulty carrying on activities because again 20/100 is quite poor vision. Medically when you measure vision after 20/100, the next medical measurement is 20/200, which is

legally blind. Thus if the individual does not meet our standard of 20/100 in an eye, that means that his vision in that eye would be 20/200 or worse, or in other words he would be legally blind in that eye. I just think that from a medical point of view, it would be a mistake to let an individual function as a Peace Officer of any type who is legally blind in an eye if for one reason or another his glasses or contact lenses were not available to him.

In addition, the ALJ also found:

At the time Mr. Tervo applied for the job with [respondent], he also applied for other jobs in "management." Additionally, he applied for a job as a juvenile correction counselor at Glen Lake with [respondent] but was not hired for that position. Mr. Tervo also applied for a position as a health care assistant at the Detox Center in Minneapolis.

Mr. Tervo currently is employed as a Human Services Technician at the Metro Regional Treatment Center in Anoka. Mr. Tervo is aware of jobs in the law enforcement and correction fields that do not have vision acuity standards but has not applied for any of these jobs because he has not been aware of any openings (e.g. probation or parole officers). Tervo has filed applications for corrections officer positions with the correctional facilities at Lino Lakes and at Shakopee. He was given an oral examination for the Shakopee job and is currently on their potential employee list.

When issuing the September 11, 1987, order, the ALJ stated that the partial summary judgment was not a "final decision" for the purposes of appeal.

At the second hearing, on November 11, 1987, the ALJ granted partial summary judgment in favor of respondent dismissing relator's action for unfair discriminatory practices under Minn.Stat. § 363.03. The ALJ reasoned:

[I have] already determined that [Tervo] is not disabled within the meaning of Minn.Stat. § 363.01, subd. 25 (1984). Consequently, the allegations contained in the Complaint based on "disability"

discrimination were dismissed. Complainant now alleges a separate violation of Minn.Stat. §§ 363.03, subd. 1(4)(a) and 363.02, subd. 1(7)(i) (1984) because Mr. Tervo was not offered employment by the Respondent before a physical examination was administered to him. * * * [T]his type of action was not contemplated by the Human Rights Act; * * * the enforcement of chapter 363 concerning prohibited employment practices by other than protected class members is reserved for the Commissioner of Human Rights. * * *

* * * * * *

The provisions of Minn.Stat. § 363.02, subd. 1(7)(i) must be read as modifying the "disability" language contained in Minn.Stat. § 363.03, subd. 1(4)(a). If, as in this case, an individual were able to file a charge and maintain an action based only on a prospective employer's failure to offer employment before a physical exam was administered, *any* person not a member of a protected class could also contest the fact that a physical examination did not test "for essential job-related abilities" or that the examination was not required of all persons conditionally offered employment for the same position. These practices are indications that discrimination based upon an impermissible factor, disability, may exist or be easily camouflaged and thus are appropriate for enforcement action initiated by the Commissioner. However, they are not dispositive proof of discrimination against a member of a protected class.

[I have] concluded that the type of unfair employment practice asserted by [Tervo] is something that is reserved for a commissioner-filed charge of discrimination. To read the cited statutes any more broadly would result in an extension of the Human Rights Act to persons whom it is not intended to cover.

Both the September 11, 1987 and November 11, 1987 orders were made final for the purposes of appeal.

## ISSUES

1. Did relator establish that Tervo fell within the protected class contemplated by Minn.Stat. ch. 363 (1984) for the purpose of establishing a prima facie case of employment discrimination based upon disability?

2. Can relator bring an action for disability discrimination under Minn.Stat. § 363.02, subd. 1(7)(i) or Minn.Stat. § 363.03, subd. 1(4)(a)?

## ANALYSIS

In reviewing an award of summary judgment, this court must determine that there was no issue of material fact before the ALJ and that the law was properly applied. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979).

## I.

The Minnesota Human Rights Act provides that it is unfair employment practice for an employer because of disability "to refuse to hire or to maintain a system of employment which unreasonably excludes a person from seeking employment." Minn.Stat. § 363.03, subd. 1(2)(a) (1984). In analyzing cases brought under the Act, Minnesota has applied the test set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), consisting of a prima facie case, an answer and a rebuttal. *Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–20 (Minn.1986).

█ In order to establish a prima facie case of employment discrimination for failure to hire on the basis of disability, relator must show:

(1) that Tervo is disabled;

(2) that he applied and was qualified for a job for which the employer was seeking applicants;

(3) that, despite his qualifications, he was rejected; and

(4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of Tervo's qualifications.

*See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Danz v. Jones*, 263 N.W.

2d 395, 399 (Minn.1978). We examine first the threshold issue of whether Tervo is disabled within the meaning of the Human Rights Act.

Relator argues that dismissal of Tervo's charge of discrimination was the result of a too restrictive interpretation of the meaning of disability under the Human Rights Act, and urges, instead, that:

Tervo's visual impairment not only substantially limited his ability to obtain employment as a Detention Deputy with Hennepin County, but, no doubt, would substantially limit his ability to obtain employment in law enforcement elsewhere in Minnesota and the nation. Because working is a major life activity and because Tervo's visual impairment substantially limited his ability to engage in this activity, Tervo, therefore, has a condition or characteristic which rendered him a disabled person within the meaning of clause (1) of the statutory definition.

Under the Minnesota Human Rights Act, a disability is "any condition or characteristic that renders a person a disabled person." Minn.Stat. § 363.01, subd. 25. The Act defines "disabled person" as meaning:

[A]ny person who (1) has a physical or mental impairment which substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

*Id.*

Although there are several Minnesota cases involving disability discrimination, we find no case which construes the language of section 363.01, subd. 25. Relator relies on four Minnesota cases to support its claim that Tervo was a "disabled person:" *Lewis ex rel. Quinn v. Ford Motor Co.*, 282 N.W.2d 874 (Minn.1979); *Lewis ex rel. Durham v. Remmele Engineering, Inc.*, 314 N.W.2d 1 (Minn.1981); *Lewis ex rel. Welles v. Metropolitan Transit Commission*, 320 N.W.2d 426 (Minn.1982); *Gomez–Bethke v. Metropolitan Airport Commission*, 358 N.W.2d 432 (Minn.Ct.App.1984). However, in none of these cases was the reviewing court called upon to determine whether the charging party was in fact

disabled within the meaning of the Act. The charging party's "disability" was not an issue on appeal in any cases cited by relator. Here we must answer the question of whether Tervo is disabled within the meaning of the Act. Therefore, those cases upon which relator relies are of little assistance to us. We must look elsewhere.

When construing the Minnesota Human Rights Act, the Minnesota Supreme Court has "applied principles developed in the adjudication of claims arising under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e (1976)" because of the "substantial similarities in the language and purposes of the two statutes." *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 441 (Minn.1983). *See also Fisher Nut Co. v. Lewis ex rel. Garcia*, 320 N.W.2d 731, 734 (Minn.1982); *Danz v. Jones*, 263 N.W. 2d at 399.

When defining "disabled person" in section 363.01, subd. 25, the legislature used language which is identical to that used by Congress to define the term "handicapped individual" in section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U.S.C. § 794. Therefore, we deem it appropriate for us to follow the federal courts' analyses in section 504 decisions.

In *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the United States Supreme Court concluded that the regulations promulgated by the Department of Health and Human Services were of significant assistance in determining whether a particular individual was handicapped as defined by the Act. Referring to the regulations, the *Arline* court stated:

[T]hey provide "an important source of guidance on the meaning of § 504." * * * [T]hey define two critical terms used in the statutory definition of handicapped individual. "Physical impairment" is defined as follows:

"[A]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: * * * special sense organs; * * *"

In addition, the regulations define "major life activities" as:

"functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

*Id.* at ——, 107 S.Ct. at 1127 (citations omitted).

■ In view of the substantial similarities between the language of the Human Rights Act and that of section 504, we adopt the definitions used in the regulations for the terms "physical impairment" and "major life activities." We agree that Tervo can be described as having a "physical impairment" and do not dispute that this has interfered with his ability to obtain one specific job. However, to fall within the class of "disabled person" under the Human Rights Act, Tervo's impairment must substantially limit one or more major life activities, to wit: his ability to work.

The *Arline* court stressed "that a physical or mental impairment does not constitute a handicap for the purposes of section 504 unless its severity is such that it results in a substantial limitation of one or more major life activities." *Id.* at ——, 107 S.Ct. at 1127 n. 5. In *Arline*, the complaining party had tuberculosis which was serious enough to require hospitalization. There the supreme court held that this was "a fact more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment." *Id.* at ——, 107 S.Ct. at 1127.

In *E.E. Black, Ltd. v. Marshall*, 497 F.Supp. 1088 (D.Hawaii 1980), the court concluded that a case-by-case analysis was necessary to determine whether an impairment constituted a substantial handicap to employment and listed factors which could be used to determine whether a person was a "handicapped individual":

Factors that are important * * * are the number and types of jobs from which the impaired individual is disqualified. * * * In evaluating whether there is a substantial handicap to employment, it must be assumed that all employers offering the

same job or similar jobs would use the same requirement or screening process.

\*  \*  \*  \*  \*  \*

Once it is determined how many employers would be affected by the criteria, it must be determined what types of jobs the rejection would apply to. And such a determination must be made objectively. \* \* \*

Next, it must be determined to what geographical area the applicant has reasonable access. \* \* \*

Finally, the individual himself must be considered. His own job expectations and training must be taken into account. \* \* \*

Certainly, if an applicant were disqualified from an entire field, there would be a substantial handicap to employment. But, questions as to subfields and the like must be answered on a case-by-case basis \* \* \*.

*Id.* at 1100–02.

In *Tudyman v. United Airlines,* 608 F.Supp. 739 (D.C.Cal.1984), an airline steward attempted to establish that he was handicapped because his weight exceeded the restriction imposed by the airline. He argued "that because the weight restriction prevent[ed] him from obtaining a job, for which he would otherwise be qualified, the requirement transform[ed] him into a handicapped individual as it [was] his body composition that prevent[ed] him from meeting this requirement." *Id.* at 745. The court rejected this argument and stated:

There is, however, no authority for the proposition that failure to qualify for a single job because of some impairment \* \* \* constitutes being limited in a major life activity as *inter alia* "working," \* \* \*.

*Id.* The court held:

[T]here are limits to who can be considered handicapped \* \* \*. A person who exceeded the maximum weight for a United flight attendant because he is an avid body builder is not limited in a ma-

jor life activity—he is only prevented from having a single job.

*Id.* at 746.

In *Jasany v. United States Postal Service,* 755 F.2d 1244 (6th Cir.1985), the court construed the meaning of "substantial limitation of a major life activity," and held that the complaining party's strabismus (cross-eyes) did not amount to a handicap because the condition "had never had any effect whatsoever on any of his activities, including his past work history and ability to carry out duties at the post office apart from operation of the LSM–ZMT."[1] *Id.* at 1250.

■ Mindful of the *Black* court's emphasis on the necessity for case-by-case determination of whether an impairment substantially limits a major life activity, we conclude that Tervo's impairment does not. He was disqualified from obtaining only one specific job. No evidence was presented to show that his eyesight and high tone hearing loss had affected his past work history in any way. He has a B.S. degree, and is qualified to perform other jobs. Indeed, the training course which he abandoned would have qualified him for the position of probation officer for which respondent has no vision requirement. We find it inconceivable that Tervo's shortsightedness and high tone hearing loss could "substantially limit" his ability to work. Therefore, Tervo does not meet the threshold requirement for bringing a disability discrimination claim under the Human Rights Act.

■ Relator also argues that respondent discriminated against Tervo by "regarding" him as having an impairment, in violation of Minn.Stat. § 363.01, subd. 25(3).

This argument must also fail. The supreme court in *Arline* considered the circumstances under which a person is "regarded as having" a physical impairment:

[The] history [of section 504] demonstrates that congress was as concerned about the effect of an impairment on others as it was about its effect on the individual. Congress extended coverage,

1. LSM–ZMT is a mail sorting machine.

in 29 U.S.C. § 706(7)(iii), to those individuals who are simply "regarded as having" a physical or mental impairment. The Senate Report provides as an example of a person who would be covered under this subsection "a person with some kind of visible physical impairment which in fact does not substantially limit that person's functioning." * * * Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment.

* * * By amending the definition of "handicapped individual" to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledges that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness. Even those who suffer or have recovered from such noninfectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious.

*Arline*, at ——, 107 S.Ct. at 1128–29 (footnotes omitted). The *Arline* court gave two examples to illustrate how individuals could be improperly "regarded as having" a physical or mental impairment: (1) where "a court ruled that a cerebral palsied child, who was not a physical threat and was academically competitive, should be excluded from public school, because his teacher claimed his physical appearance 'produced a nauseating' effect on his classmates,"

and (2) where "a woman 'crippled by arthritis' was denied a job not because she could not do the work but because 'college trustees [thought] "normal students shouldn't see her." ' " *Id.* at ——, 107 S.Ct. at 1128 n. 9.

In this case, respondent disqualified Tervo because his vision did not meet the requirement for a Detention Deputy. Although Tervo's impairment was not self-imposed as was that of the complaining witness in *Tudyman,* the reasoning of that court is nonetheless helpful:

> For the same reason that the failure to qualify for a single job does not constitute a limitation on a major life activity, refusal to hire someone for a single job does not in and of itself constitute perceiving the plaintiff as a handicapped individual. If this were the case, then anyone who failed to obtain a job because of a single requirement which may not be essential to the job would become a handicapped individual because the employer would thus be viewing the applicant's failure as a handicap. This court refuses to make the term handicapped a meaningless phrase.

*Tudyman,* 608 F.Supp. at 746. Under the *Tudyman* rationale, the refusal to hire Tervo for one specific job, without more, does not constitute respondent's perceiving Tervo as a handicapped individual.[2]

## II.

Finally, relator argues that the ALJ erred in dismissing its claim of unfair employment practices under Minn.Stat. §§ 363.02, subd. 1(7)(i) and 363.03, subd. 1(4)(a). Again, we find no Minnesota decisions which are dispositive.

■ Relator maintains that Tervo has a claim for disability discrimination because respondent required him to complete a

---

2. Even if we were to accept for the purpose of argument that Tervo was regarded as disabled, we would still conclude that his failure to pass the physical examination disqualified him from the job he sought. The *Arline* court stated:
   [T]he definition of "handicapped individual" is broad, but only those individuals who are both handicapped *and* otherwise qualified are eligible for relief.

*Arline* at ——, 107 S.Ct. at 1129–30. The successful completion of a preemployment physical which tests for "minimum objective qualifications" of the job, is an integral part of the application process. *State of Minnesota, by Khalifa v. Hennepin County,* 420 N.W.2d 634 (Minn.Ct.App.1988). Consequently, Tervo did not meet the "otherwise qualified" requirement of *Arline.*

physical without first making Tervo a job offer. Section 363.02, subd. 1(7)(i) provides:

It is not an unfair employment practice for an employer * * *:

(i) to require or request a person to undergo physical examination, which may include a medical history, for the purpose of determining the person's capability to perform available employment, provided (a) that an offer of employment has been made on condition that the person meets the physical or mental requirements of the job; (b) that the examination tests only for essential job-related abilities; * * *

We agree that respondent did not comply with the statutory requirements, and had Tervo been a disabled person, he would undoubtedly have had a claim under Minn. Stat. § 363.02, subd. 1(7)(i). However, because Tervo was not a "disabled person," we agree with the ALJ's determination that Tervo could not maintain an action for discrimination under these sections.

Minn.Stat. § 363.06 provides that a person "aggrieved by a violation of this chapter may bring a civil action" or "may file a verified charge with the commissioner." In addition, when the commissioner "has reason to believe" that a violation of section 363.03 has taken place, the commissioner has authority to independently issue a charge against an employer. Minn.Stat. § 363.06, subd. 2. We have carefully examined the language of the statute and conclude that the legislature intended that a person has standing to bring a claim under section 363.02, subd. 1(7)(i) only if he or she is in actuality a disabled person within the meaning of the Act.

Similarly, relator argues that Tervo should be permitted to bring a claim for discrimination because respondent required him to complete a five page medical history questionnaire. This claim was also dismissed because Tervo was not a disabled person.

Minn.Stat. § 363.03, subd. 1(4)(a) provides:

Except when based on a bona fide occupational qualification, it is an unfair employment practice:

* * * * * *

(4) For an employer * * * to

(a) require the person to furnish information that pertains to * * * disability, unless, * * * for the purpose of compliance with * * * any rule, regulation or laws of the United States or of this state requiring information pertaining to * * * disability * * *.

*Id.* Respondent required Tervo to fill out a "history check sheet." Arguably, this document was but part of the pre-employment medical and does not rise to the level of an inquiry prohibited under section 363.03, subd. 1(4)(a). However, even if the respondent violated the statutory mandate, we again conclude that apart from charges initiated by the Commissioner himself, only an individual within a protected class has standing to bring an action for violation of Minn.Stat. § 363.03, subd. 1(4)(a). Because Tervo, the charging party in this case, is not within the protected class, he cannot bring an action under section 363.03, subd. 1(4)(a).

## DECISION

The charging party did not fall within the protected class of "disabled person" and had no standing to file a charge under the Minnesota Human Rights Act for employment discrimination based upon disability.

Affirmed.