**STATE of Minnesota, by Stephen W. COOPER, Commissioner, Department of Human Rights, Appellant,**

v.

**HENNEPIN COUNTY, Respondent.**

**No. C9–87–2434.**

Supreme Court of Minnesota.

June 2, 1989.

---

Hubert H. Humphrey, III, Atty. Gen., Audrey A. Zibelman, Sp. Asst. Atty. Genl., St. Paul, for appellant.

Thomas L. Johnson, Hennepin County Atty., Janeen F. Rosas, Asst. County Atty., Minneapolis, for respondent.

David Moss, Minneapolis, amicus curiae for Epilepsy Foundation of Minnesota, et al.

Richard L. Varco, Jr., Sp. Asst. Atty. Gen., St. Paul, amicus curiae, for MN State Council on Disability.

Charles T. Mottl, St. Paul, amicus curiae for MN State Svs. for Blind & Visually Impaired.

POPOVICH, Chief Justice.

Appellant Commissioner of the Minnesota Department of Human Rights ("Department"), alleged discrimination on the basis of disability by respondent Hennepin County against Allan Tervo, an applicant for the position of detention deputy. The claim arose out of a discrimination charge filed by Tervo with the Department. The Commissioner found probable cause existed and filed a complaint under Minn.Stat. § 363.06, subd. 4(3) (Supp.1983). On September 11, 1987, an administrative law judge (ALJ) granted Hennepin County's motion for summary judgment on the ground Tervo did not qualify as a "disabled person" under Minn.Stat. § 363.01, subd. 25a. On No-

vember 17, 1987, the ALJ also granted summary judgment dismissing Tervo's claim of unfair employment practices under Minn.Stat. §§ 363.03, subd. 1(4)(a), and 363.02, subd. 1(7)(i) (Supp.1983), on the ground Tervo was not a member of a protected class under the statute.

The Minnesota Court of Appeals affirmed the ALJ's award of summary judgment in *State by Cooper v. Hennepin County*, 425 N.W.2d 278 (Minn.App.1988), holding Tervo was not a "disabled person" under the Minnesota Human Rights Act since his impairment did not substantially limit one or more major life activities. The court also dismissed Tervo's claim of unfair employment practices under Minn.Stat. §§ 363.02, subd. 1(7)(i), and 363.03, subd. 1(4)(a), on the ground that Tervo was not a "disabled person" and therefore could not maintain an action for discrimination under these sections. We affirm.

## I.

On February 21, 1984, Allan Tervo applied for the position of detention deputy with Hennepin County. Tervo knew of the position from reading an employment notice posted on a bulletin board at Minneapolis Community College, which listed the following requirements:

> Successful completion of two years of college or vocational technical coursework (with a GPA of 2.0 or higher on a 4.0 scale). An emphasis in a criminal justice field (i.e. police science, law enforcement, corrections) or a behavioral science field (i.e. sociology, psychology) is preferred. Two years of experience in corrections, law enforcement or military police may be substituted for the education requirement.

The job description required a detention deputy to carry out the statutory detention functions of the Office of the Sheriff: to fingerprint, book, secure and release inmates. On his application, Tervo indicated he would accept a position in law enforcement, corrections or welfare. In addition to the application, Tervo was required to complete a written examination, separate oral and psychological interviews, and a strength and agility test. After completing the strength and agility test, Tervo received a letter from Hennepin County notifying him he was one of 30 finalists for the detention deputy position out of 900 original applicants. Before receiving an employment offer Tervo received a letter instructing him to report for a physical examination.

Tervo went to Dr. Richard Cohan at Methodist Hospital where he completed a five-page medical history form and underwent a physical examination. Dr. Cohan submitted a pre-employment medical evaluation report which stated:

> Physical and laboratory results show that the applicant does not meet the requirements of the Hennepin County Sheriff's Department because of distant vision not 20/100 uncorrected and high tone hearing loss [in the right] ear.

Hennepin County requires uncorrected distant vision of 20/100 in each eye. Tervo has uncorrected distant vision of 20/200 and corrected vision of 20/15. He also has a high tone hearing loss in his right ear. After his physical Tervo received a letter from Hennepin County indicating he had been eliminated from consideration for the detention deputy position. Tervo then telephoned Hennepin County and was told once again he had been rejected and no exceptions would be made.

Tervo graduated from Chisholm High School in Chisholm, Minnesota in 1971. Following his high school graduation, he worked as an administrative assistant in the United States Marine Corps for two years. He began his college education at Moorhead State University in 1974 and graduated with a Bachelor of Arts degree from the University of Minnesota–Duluth in November 1979, majoring in communications and minoring in psychology. Upon graduation he hoped to get a job in social services, specializing in juvenile counseling. Following graduation, he worked at the Development Achievement Center in Duluth for three months as an assistant teacher and driver, and next worked at Abbott–Northwestern Hospital as a child care counselor at a treatment home. Following

his work at Abbott–Northwestern, Tervo served as: a delivery driver for Macklen Products from April 1981 to August 1981; a charter bus driver for Associated Transportation Services from September 1981 to November 1982; and a human services technician for the Minnesota Veteran's Home from May 1983 to November 1983.

When Tervo applied for the detention deputy position in February 1984, he had been enrolled for one month in a law enforcement training program at Minneapolis Community College. Tervo enrolled in the course in order to obtain a certificate in law enforcement which would allow him to take the Peace Officer Standards and Training (P.O.S.T.) board examination. At the time he entered this course, his career goal was to work in law enforcement. Tervo completed three classes during the January to March 1984 quarter, earning ten credits and grades of two B's and one A. Twenty-four credits were necessary for completion of the program. Tervo applied for the detention deputy position because he knew it was open to civilians and thought he could qualify without having yet completed the courses necessary to take the P.O.S.T. examination.

Tervo was enrolled in his second quarter when he was turned down by Hennepin County. He then consulted with several of his instructors regarding the existence of vision standards among law enforcement agencies generally. His instructors informed him these standards were common. Tervo also personally contacted several law enforcement agencies to determine their vision standards and was informed they had standards similar to Hennepin County's. Based on Hennepin County's rejection and his further investigation of other agencies, Tervo discontinued his course of study in law enforcement. He decided he did not want to waste time and money on something which would produce no advancement possibilities.

After abandoning his coursework, Tervo continued to look for positions in law enforcement and corrections. He applied for positions at the Minnesota Correctional Facilities in Lino Lakes and Shakopee. Tervo

also filled out applications in management and juvenile counseling. In August 1984, Tervo began working as a night janitor at the Lilydale Racquet Club. He worked there for one year. Tervo began working at the Metro Regional Treatment Center as a human services technician in November 1985 and was employed there at the time of this action. In the fall of 1986, hopeful that his human rights claim would be successful, Tervo again enrolled in the law enforcement training program at Minneapolis Community College and completed the program in June, 1987.

## II.

This matter comes before the court on review of summary judgment in favor of Hennepin County. "On an appeal from summary judgment, the role of the reviewing court is to review the record for the purpose of answering two questions: (1) whether there are any genuine issues of material fact to be determined, and (2) whether the trial court erred in its application of the law." *Offerdahl v. University of Minnesota Hospitals & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). The moving party has the burden of proof on summary judgment. *Nord v. Herreid,* 305 N.W.2d 337, 339 (Minn.1981). On review an appellate court must view the evidence in the light most favorable to the party against whom the motion was granted. *Grondahl v. Bulluck,* 318 N.W.2d 240, 242 (Minn. 1982).

## III.

This matter is governed by the Minnesota Human Rights Act ("the Act") which provides it is an unfair employment practice for an employer because of disability "to refuse to hire or to maintain a system of employment which unreasonably excludes a person seeking employment." Minn.Stat. § 363.03, subd. 1(2)(a) (Supp. 1983). The Act defines disability as:

[A]ny condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical or mental impairment which substantially limits one or more major

life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

Minn.Stat. § 363.01, subd. 25 (Supp.1983). A complainant under the Act bears the burden of proving he falls within one of the classes of individuals protected under the Act.[1] As such, Tervo must prove he is a disabled person within the meaning of the Act.

In construing the definition of "disabled person" under the Act, the court of appeals sought guidance from interpretations of section 504 of the Rehabilitation Act of 1973, 87 Stat. at 394, codified as amended at 29 U.S.C. § 794 (1982) ("section 504"). This is appropriate since the language used by Congress in the 1974 amended version of section 504 to define a "handicapped individual" is identical to the definition used by the Minnesota legislature in the Human Rights Act. *See* 29 U.S.C. § 706(7)(B) (1982).

In *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the United States Supreme Court concluded that regulations promulgated by the Department of Health and Human Services were of significant assistance in determining whether a particular individual was handicapped as defined by section 504. *Id.* at 279, 107 S.Ct. at 1126. The regulations define several critical terms used in the statutory definition of handicapped individual. "Physical or mental impairment" is defined as:

[A]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-uri-

nary; hemic and lymphatic; skin; and endocrine.

45 C.F.R. § 84.3(j)(2)(i)(A) (1988). In addition the regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. 84.-3(j)(2)(ii) (1988). Since the definitions provided in the Human Rights Act and section 504 are identical, the interpretations provided in the regulations for the terms "physical or mental impairment" and "major life activities" are helpful in this matter. The parties do not dispute the fact Tervo's poor vision and high tone hearing loss are physical impairments within the meaning of section 504 since both conditions affect special sense organs. The dispute involves other parts of the definition: (1) whether Tervo's impairments *substantially* limited one or more of his major life activities and (2) whether he is *regarded as having* such an impairment.

### 1. *Substantially Limited*

In order to qualify as a "disabled person" under the Act, Tervo must be substantially limited by his impairment in one or more major life activities. The court of appeals relied on language in the supreme court's *Arline* opinion which stressed "that a physical or mental impairment does not constitute a handicap for the purposes of section 504 unless its severity is such that it results in a substantial limitation of one or more major life activities." *Arline*, 480 U.S. at 280 n. 5, 107 S.Ct. at 1127 n. 5. Arline's tuberculosis was considered a handicap under the second prong of the definition, since she had a record of a substantially limiting impairment:

[Arline's] impairment was serious enough to require hospitalization, a fact more than sufficient to establish that one

---

**1.** The court of appeals analyzed this case under the test set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The test is only used in cases where there is no direct evidence of discrimination and a disparate impact analysis must be used. When this court has applied the *McDonnell* test in the past it has stated that the test would only be used for "disparate treatment claims brought under the Minnesota Human

Rights Act." *Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–20 (Minn.1986). Here Hennepin County does not dispute the fact their decision to remove Tervo from the selection process was based on his uncorrected distant vision of 20/200 and his high tone hearing loss. There is direct evidence Hennepin County's decision to reject Tervo was based on his physical impairments and no disparate treatment analysis need be used.

or more of her major life activities were substantially limited by her impairment. Thus, Arline's hospitalization for tuberculosis in 1957 suffices to establish that she has a 'record of * * * impairment' within the meaning of 29 U.S.C. § 706(7)(B)(ii), and is therefore a handicapped individual.

*Id.* at 281, 107 S.Ct. at 1127. Tervo does not have a record of such an impairment. His hearing and vision problems have never substantially affected his ability to see or hear. He has also never had any problem getting work on the basis of these physical impairments. *See, Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985) (plaintiff whose condition had never had any effect whatsoever on any of his activities failed to establish a prima facie case of handicap discrimination).

Under the first prong of the definition, an individual may also be substantially limited in present or future activities. The federal regulations define "substantially limits" as "the degree that the impairment affects employability. A handicapped individual who is likely to experience difficulty in securing, retaining or advancing in employment would be considered substantially limited." 41 C.F.R. § 60–741, App. A (1987). In *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088 (D.Hawaii 1980), the federal district court listed factors to be applied on a case-by-case basis to determine whether a person is substantially limited in securing a job due to a physical or mental impairment. Looking at each individual case the court must determine (a) the number and types of jobs from which the impaired individual is disqualified, (b) the geographic area to which the applicant has reasonable access, (c) the applicant's own job expectations and training, (d) the criteria or qualifications in use generally, and (e) the types of jobs to which the rejection would apply. *Id.* at 1100–01. Under the *Black* factors a court must assume "that all employers offering the same job or similar jobs would use the same requirement or screening process." *Id.* at 1100. If such an assumption were not made the applicant would bear the burden of proving

that specific employers in the area use different requirements that would not exclude him/her. In this case the court must assume all other agencies will require uncorrected vision of 20/100 for the position of detention deputy since there is no evidence to suggest there are employers with other standards in the area.

The *Black* analysis was applied in *Tudyman v. United Airlines,* 608 F.Supp. 739 (C.D.Cal.1984), where a flight attendant claimed he was handicapped when he was denied a job with an airline as a result of his failure to meet the airline's weight restriction. He argued "that because the weight restriction prevent[ed] him from obtaining a job, for which he would otherwise be qualified, the requirement transform[ed] him into a handicapped individual * * *." *Id.* at 745. The court rejected this argument and stated:

There is, however, no authority for the proposition that failure to qualify for a single job because of some impairment * * * constitutes being limited in a major life activity. The regulations define major life activity as, *inter alia,* "working," 45 CFR § 84.3(j)(2)(ii), but not "working at the specific job of plaintiff's choice."

*Id.* The court relied on the *Black* court's reasoning that "the inability to obtain a single job does not render one 'handicapped.'" *Id.*

Applying this reasoning, Tervo fails to meet the substantially limited standard. Tervo has only been rejected for one specific job. He has completed his law enforcement training program and is qualified to obtain other jobs in the field. Even if we assume Tervo cannot obtain a detention deputy position with another agency, there are many different jobs in law enforcement for which he would still be qualified. Tervo himself admits his impairments would not disqualify him for positions as a probation or parole officer. He has not yet applied for these positions. Tervo did, however, apply for positions at the Minnesota correctional facilities at Shakopee and Lino Lakes and has yet to hear a response regarding those applications. In addition, Tervo has expressed interest in positions

outside the law enforcement field. He has applied for jobs in management and juvenile counseling and on his application to Hennepin County indicated he would be willing to accept a position in welfare, corrections or law enforcement. Tervo has not been substantially impaired in the area of employment by this rejection for a single position with Hennepin County. Therefore, he fails to meet the definition of a disabled person under the Human Rights Act.

### 2. *Regarded as having an impairment*

The Department argues even though Tervo may not meet the portion of the disability test requiring an impairment which substantially limits major life activities, he does meet the third prong of the test which extends coverage to those individuals who are simply "regarded as having" a physical or mental impairment. Congress expanded the definition in 1974 to include such individuals in order "[t]o combat the effects of erroneous but nevertheless prevalent perceptions about the handicapped * * *." *Arline*, 480 U.S. at 279, 107 S.Ct. at 1126. Regulations promulgated after the act interpret the phrase "is regarded as having such an impairment" to mean:

> (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; (3) or has none of the impairments defined * * * but is treated by an employer as having such an impairment.

29 C.F.R. § 1613.702 (1988). Congressional legislative history also sheds light on the meaning of this phrase:

> This subsection includes within the protection of sections 503 and 504 those persons who do not in fact have the condition which they are perceived as having, as well as those persons whose mental or physical condition does not substantially limit their life activities and who thus are not technically within [the first prong] in the new definition. Members of both of these groups may be subjected to discrimination on the basis of their being regarded as handicapped.

S.Rep. No. 93–1297, 93rd Cong., 2nd Sess. *reprinted in* 1974 U.S.Code Cong. and Ad. News 6373 at 6389–90.

■ These interpretive regulations suggest the "substantial limitations" requirement may be met not only by past hardships suffered by a plaintiff, but also by the possibility of future discrimination based on the plaintiff's perceived handicap. As the Supreme Court stated in *Arline*: "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment." *Arline*, 480 U.S. at 283, 107 S.Ct. at 1128–29. In *Arline*, the Court provided examples of individuals who would fit under this portion of the definition: (1) a cerebral palsied child and (2) a woman crippled by arthritis. *Id.* These individuals possess physical characteristics which an employer may perceive as limiting even though the applicant is qualified to perform the job. Hennepin County did not make such a false perception in regard to Tervo.

■ The Department argues Hennepin County perceived Tervo as possessing a disabling condition which substantially limited his ability to see. In reality, however, Hennepin County simply stated that Tervo failed to meet its uncorrected vision standard of 20/100. Hennepin County was aware that with glasses Tervo's vision could be corrected to 20/15. Therefore, it did not perceive him as being substantially limited in his ability to see. This case differs significantly from one involving a blind person or other individual whose visual problems are uncorrectable. Hennepin County's decision not to hire Tervo was not based on its perception of him as disabled, but rather on his failure to meet a job qualification necessary to protect the safety of employees and prisoners.

Allowing Tervo to qualify under the third prong of the disability definition would result in an expansion of disability protection

beyond the logical scope of the Act. As the *Tudyman* court pointed out, under such an expansive reading any individual rejected for a single job based on a physical impairment would be considered disabled under the law:

> For the same reason that the failure to qualify for a single job does not constitute a limitation on a major life activity, refusal to hire someone for a single job does not in and of itself constitute perceiving the plaintiff as a handicapped individual. If this were the case, then anyone who failed to obtain a job because of a single requirement which may not be essential to the job would become a handicapped individual because the employer would thus be viewing the applicant's failure as a handicap. This court refuses to make the term handicapped a meaningless phrase.

*Tudyman,* 608 F.Supp. at 746. Hennepin County did not perceive Tervo as being substantially limited in a major life activity of seeing or working; he was simply rejected on the basis of his failure to meet a qualification of the job. As such he fails to meet the definition of a disabled person under the Human Rights Act.

## IV.

The Department argues the court of appeals erred in stating that even if Tervo were considered disabled, his failure to pass the physical examination disqualified him from the job due to the fact that he failed to meet the "otherwise qualified" requirement of *Arline.* *Cooper,* 425 N.W.2d at 285 n. 2. The court of appeals' decision was based solely on its holding that Tervo was not disabled under the Human Rights Act. The Department urges us not only to overrule the court of appeals in this matter, but also *State by Khalifa v. Hennepin County,* 420 N.W.2d 634 (Minn. App.1988), fearing erosion of the Human Rights Act's prohibition against disability discrimination in employment. In that case, petition for review by the court and petition for reconsideration were denied.

The Department's fears are speculative and unwarranted. The factual record in *Khalifa* was much different than this matter and the footnote reference by the court of appeals in this matter is pure *dicta* and a gratuitous comment that was not essential to its decision. There is no need to discuss that portion of the opinion.

This court is aware of the breadth and interest of persons with disabilities and groups representing them. Various amici have outlined goals and missions:

(1) To assist persons with disabilities to secure maximum independence and self-sufficiency by having equal access to employment opportunities;

(2) To assure employment opportunities are based on objective evaluations and not subjective presumptions;

(3) To assist persons with disabilities to live independently, and to fully participate in the community;

(4) To promote the dignity, safety, and rights of disabled persons;

(5) To eliminate confusion over the issue of minimum qualifications and reasonable accommodation;

(6) To provide employment placement and vocational services for disabled persons and to assist them in reentering previous employment or funding alternative employment suited to their strengths and abilities;

(7) To assist persons with disabilities to avoid relying on federal and state tax dollars, depending on public assistance, or existing on subsistence levels of income.

This court has empathy for and supports these goals. However, the facts in this matter are vastly different than the usual case of disability discrimination. To find discrimination here would be stretching and expanding the definition concepts as interpreted by federal cases. Our review of the contemporaneous 1983 legislative history of Chapter 276, Laws of 1983, does not support the expansive interpretation being urged upon us.[2] Obviously, if the

---

**2.** In fact, one of the reasons given for adoption of the legislation was, "For one thing, federal regulations have been in constant litigation and there have been conflicting and limiting court

legislative authors disagree with us, they are in a position to enact legislation which would permit a finding of employment discrimination under these or similar facts.

Affirmed.

COYNE, Justice (dissenting).

I respectfully dissent. Although it may well be that visual acuity without any corrective lenses is a bona fide occupational qualification for the job of detention deputy, that is not the question before us. Neither is the wisdom of the commissioner's finding of probable cause to believe that Hennepin County discriminated against Allan Tervo on the basis of disability. The question is whether the Minnesota Human Rights Act authorizes the commissioner of human rights to inquire into the bona fides of the occupational qualification set by Hennepin County. In my opinion the Act does just that.

Let me say at the outset that much of the difficulty in this case seems to me to be the product of a conflict between statutory criteria and ordinary, everyday usage and perspective. For example, in the ordinary course of things neither the myopic person nor anyone else is likely to consider myopia a disability if normal or nearly normal vision can be achieved through the use of corrective lenses. Common experience tells us that many people see perfectly well when wearing eyeglasses or contact lenses so that their impairment does not interfere with ordinary activities. If, on the other hand, a defective condition of the eye is not amenable to correction, the visual impairment may significantly interfere with carrying on important life activities. In that case, the visual impairment constitutes a disability. In short, an impairment such as Mr. Tervo's, reduced to normalcy by corrective lenses, or some other impairment remedied by prosthesis or by medication does not demonstrate that actual lack of "competent power, strength, or physical or mental ability," or the incapacity to per-

form an occupation, which is the commonly understood definition of "disability." *The American College Dictionary* 343 (1962).

The legislative definition of the term "disability" adopted for purposes of Minnesota's Human Rights Act, however, varies considerably from the common usage or dictionary definition. Minn.Stat. § 363.01, subd. 25 (1984), defines "disability" in these words:

[A]ny condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical or mental impairment which substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

To say, as does Hennepin County and the majority, that Hennepin County did not regard Tervo as having a disability, that he simply failed to meet Hennepin County's uncorrected vision standard, is mere sophistry. Clearly, Hennepin County regards Mr. Tervo's uncorrected vision of 20/200 as disabling him from performing the duties of a detention deputy; why else does it defend its uncorrected vision standard of 20/100 as "necessary to protect the safety of employees and prisoners"?

Indeed, once Tervo removes his corrective lenses he is a person who has a physical impairment which substantially limits one or more major life activities, thus meeting the first prong of the statutory definition. As Hennepin County's medical examiner puts it, without corrective lenses Tervo is "legally blind."

Quite frankly, from the standpoint of the commissioner's authority to inquire into the matter, I see little distinction between Hennepin County's insistence on testing Tervo's eyesight without the benefit of his corrective lenses and a hypothetical school district's denial of a teaching position to a one-legged applicant because it considers a teacher's ability to patrol halls and play-

cases and currently it is very difficult to bring discrimination cases under the federal rules." Hearing on S.F. No. 529 before the Civil Law Subcom. of the Senate Judiciary Comm., 73rd Minn.Leg., Mar. 16, 1983 (statement by uniden-

tified speaker discussing amendments to Minn. Human Rights Act). Amending the Minnesota Human Rights Act with the identical federal language could only result in similar interpretations.

ground without benefit of either prosthesis or crutches a job qualification necessary to protect the safety of pupils and fellow teachers. I have not the least doubt that the majority would recognize the commissioner's right to question the bona fides of the school district's qualification standard on the ground either that the school district regarded the teacher applicant's less common impairment as a disability or that when deprived of equipment designed to correct or ameliorate the effects of an impairment, the candidate has an actual disability.

Nor do I doubt that the majority would acknowledge the commissioner's authority pursuant to the Minnesota Human Rights Act to assert a claim that the commissioner of highways had unlawfully discriminated against any citizen who is possessed of normal visual acuity when wearing corrective lenses but who has been denied a driver's license on the ground that the citizen's uncorrected vision did not meet a standard set by the highway department.

To put it another way, I think the focus of the majority's attention has been diverted from the actual issue in this case by the fact that Tervo's impairment is one which not only afflicts a large percentage of the population but can be reduced to normalcy by the use of a device so common that it is virtually unnoticeable, and also by the fact that the majority assumes that Hennepin County's job requirement is necessary to protect the safety of employees and prisoners. That an impairment is common and amenable to correction does not make it any the less disabling if the employer deprives the impaired person of the corrective device in testing qualifications for a job. Moreover, although the fragility of eyeglasses and their vulnerability to breakage or being knocked off the wearer suggests the historical basis for setting a standard of uncorrected visual acuity as a job qualification for the position of detention deputy —with its potential for violent and even explosive working conditions—eyeglasses are no longer the only available corrective lenses. The improvement in contact lenses in recent years, their widespread use, including their use by participants in the most rugged contact sports, suggests that now may be the time for reconsideration. Certainly, that "we have always done it this way" or "everybody sets a similar standard" is not an adequate reason for denying the commissioner of the department of human services the right to scrutinize the policy.

Accordingly, I would not deny the commissioner a forum in which to raise the issue of unlawful discrimination but would hold that he has raised fact issues which preclude summary disposition.

WAHL, Justice (dissenting).

I join the dissent of Justice COYNE.